# Greenfield's Estate.

1. A deed and declaration of trust made at the same time are to be treated as one transaction.

2. When a gift of real and personal estate is executed or otherwise fixed in the beneficiary, either by a direct conveyance of the estate or the creation of an use, it is beyond the power of the donor or his representative to revoke it.  If fairly made and carried into effect, uninfluenced by fraud or circumvention, it cannot be subsequently impeached.

3. A voluntary conveyance of real estate made by one not indebted, or who reserves sufficient to pay his existing debts, cannot be impeached by *subsequent* creditors, unless it were made in anticipation of future indebtedness.

4. The difference between a deed and a will is not in the form but effect of the instrument; which, if it convey an estate *in presenti*, cannot be a *will*, for that operates only *in futuro*.

5. The general rule is that a party executing a legal instrument is presumed to be acquainted with its contents.  Where it is unconnected with suspicious circumstances and uninfluenced, actually or presumptively, by the relation between the maker of it and the party to be benefited by it, the burden of disproving the presumption lies on him who would impeach the deed.

6. A provision in a voluntary deed in favor of the counsel who drew or advised it, for his services to be performed as a trustee under it, with the further provision that the said trustee may resign the trust to the other trustees without forfeiting the compensation, is void, at least unless it be proved that

[Greenfield's Estate.]

the grantor knew of the particular provisions, and, without influence from those interested, assented to them. *If a doubt exists* in this respect, the provision for compensation is invalid; and the provision in favor of the other trustees who acted in the arrangement of the matter, through the counsel, or in connection with him, is also invalid. The trustees may, however, be decreed compensation by the proper tribunal.

7. The invalidity of the provision in favor of the trustees does not invalidate the trust in other respects, which are distinct and separate from the interests of the trustees.

8. Where, by the terms of the instrument by which the trust is created, the trust is to include whatever of the income and profits from the estate are unappropriated by the grantor at her death, the administrator of the estate of the grantor is not entitled to the unexpended balance of the income and profits.

APPEAL from the decree of the Court of *Nisi Prius* sitting in equity.

This was an appeal from the decree made at *Nisi Prius* dismissing the bill filed by Matthew Anderson, executor of the last will of Elizabeth Greenfield, deceased, against Joseph Howell, John Bouvier, Samuel Rush, and the executors of the will of Charles Roberts, deceased, the object of which was to have a certain deed, executed by Elizabeth Greenfield, dated 15th December, 1834, declared void, &c., as against complainant; and also to have an account of the receipts, disbursements, &c. under the deed, and the balance in the hands of the defendants, or at least so much of the same as consisted of the unpaid incomes of the estate remaining in the hands of defendants on the decease of Mrs. Greenfield, transferred or paid over to complainant; and for general relief.

Mrs. Greenfield was the widow of Jesse Greenfield, who had been a planter in Mississippi; after his death, she married Benjamin Roach, from whom she was afterwards divorced by an act of Assembly, and she resumed her former name. By her exertions she acquired considerable property, most of which was invested in landed estate and stocks in Mississippi. During the latter years of her life, she resided in Philadelphia.

It was alleged in the bill that her maiden name was Rees, and that Ebenezer Rees and David Rees were her brothers. Ebenezer Rees had several children; one of his daughters, Elizabeth, was married to S. W. Rush, and another, Celeste, married to Anderson, the complainant. On the other side, it was alleged that Mrs. Greenfield was illegitimate, and that she did not know who her parents were, nor their names. That the name given to her by them was Betsy Holliday. That she was born in Wales, was entrusted to David Rees, and along with her person some valuables were confided to Mr. Rees. The Reeses came to this country and brought her with them.

On the 15th December, 1834, Mrs. Greenfield executed the deed in question; at this time, she was a resident of Philadelphia, of the age of about 86 or 87, hard of hearing, and otherwise infirm. By

this deed, for the nominal consideration of one hundred dollars, she conveyed to Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, all her estate real and personal, which was alleged on the part of some of the trustees to be worth, perhaps, above $200,000. This deed, which is absolute on its face and unqualified by any trust, was recorded on the 31st December, 1834. On the day of its execution, viz. 15th December, the grantees executed *a declaration of trust*. This was not recorded until July, 1845, after the death of Mrs. Greenfield. By this deed or declaration of trust, which it was alleged remained in the custody of the grantees, the grantees declared that they held the property conveyed to them in trust " to apply the income and profits thereof as the said Elizabeth shall direct, and for want of such direction, that we will the profits, after deducting all expenses, in some stocks, invest or lend the same upon security, and that such sums shall be considered as under the same situation, and for the same trusts, as the property conveyed to us as aforesaid, and after the death of the said Elizabeth Greenfield, for the uses and purposes following, to wit," &c., in trust, after disposing of certain specific real estate in Mississippi, &c., to sell the residue, and apply the proceeds.

1st. To pay all debts due by the said Elizabeth Greenfield, and her funeral expenses, or debts which may become due.

2d. To pay all expenses and charges incident in executing this trust.

3d. To pay to each of us, the said Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, the sum of ten thousand dollars for our services; and after paying all the above,

4th. To pay to Elizabeth Rush, the wife of the said Samuel W. Rush, ten thousand dollars.

5th. To pay to John Bouvier $10,000, to be held by him in trust for the use of Celeste Rees, &c., &c., free from the control of any husband she might marry, &c.

Then to pay to various persons sundry sums of money, annuities, &c. Among others, " to pay to Joseph Howell $5000 in addition to the above sum declared to be for his services."

It is then provided, among other things—

That any of us (the trustees) may resign the trust hereby declared, to the other trustees, upon accounting to them for all moneys or property which he may have received, belonging to this estate, provided that such resignation shall not have the effect to deprive such resigning trustee of the sum of ten thousand dollars, above declared to be for his use, or any part thereof.

That on the resignation of any one of us, such resigning trustee shall make a deed of conveyance of his interest in the property hereby declared to be in trust, except as to the sum of ten thousand dollars above mentioned, which shall be accepted by the other trustees,

[Greenfield's Estate.]

before such resignation shall take effect, the deed to be made in favor of the other trustees.

On part of complainant, it was alleged that of these gentlemen, Joseph Howell stood to her in the relation of confidant and adviser. She was in the habit of consulting with him in relation to her affairs and other matters. It was at his suggestion that Mr. Bouvier was consulted as counsel in relation to making the deed in question, and, after she had consulted with him, he was employed to prepare it. It was also at his suggestion that Charles Roberts, *who until then had been a stranger* to Mrs. Greenfield, was named one of the grantees. As to Mr. Rush, it was alleged that he was little consulted about the matter, either in the preparation of the deed and declaration of trust, or in its subsequent custody or performance of the trust imposed.

That there is no evidence that the deeds were read to or by her, before execution. The answers of Messrs. Howell and Bouvier allege that the deeds were left with her for several days before execution; but so far as the answers are responsive to and in conflict with the bill, their averments are denied by the general replication; besides, they are contradicted in these particulars by the answer of S. W. Rush, their co-defendant.

It was further alleged on the part of the complainant, that from the evidence, it would appear that she was under the impression that she had made a *will*, and not a *deed*.

It was further alleged on the part of complainant, that at the time of her decease, Mrs. Greenfield was indebted to various persons; one of her debts, viz. to Christian Braubert, being on a bond executed by her on the 8th February, 1825; the other debts, so far as known, contracted *since* December 15, 1834. That complainant holds no assets for payment of the debts. That a portion · of the property in the hands of defendants at the time of the decease of Mrs. Greenfield, consisted of, or arose out of the uninvested income of her estate. The bond of Braubert amounted to about $1800.

Several answers of the respondents were filed, the substance of that of John Bouvier is as follows:

1. That between 1828 and 1833, he called upon Elizabeth Greenfield, at her request: that she had told Joseph Howell to call on respondent. At her request, he drew her will.

2. That in the fall of 1834, she sent for him again, and desired to make a change as to the disposition of her property, stating she wished to put "her property in such a way that she could have no power to change it, as she was growing old, and might become unable to manage her concerns, and she might be easily imposed upon."

3. At her request, respondent drew a set of papers, and left the names of the grantees in blank; they were exhibited to her shortly

[Greenfield's Estate.]

afterwards. When respondent next saw her, she said she wished to make alterations. Another set was then drawn and submitted to her. At last, those executed on the 15th of December, 1834, were approved, and left with her for several days.

4. That at her request, the Hon. Henry Baldwin, and Andrew Pettit, Esq., were invited to go and witness the execution of the papers. They and the trustees went to the house of Elizabeth Greenfield, and found her in the parlor. She then produced the deed and declaration of trust, as they had been prepared by respondent, and the same were there and then executed as they now are. That Judge Baldwin explained to her the nature of the papers, and asked her if she was satisfied, and if she understood what she was doing; on her answering that that was what she wished, he replied, that it was like the laws of the Medes and Persians, which could not be changed; she replied, that was what she wanted.

5. That the said Elizabeth Greenfield afterwards expressed herself pleased that the same had been done.

6. That she directed the said trustees to do every thing for her good.

7. That respondent admits the declaration of trust was not recorded till the 10th of July, 1845.

8. That he cannot tell the value of the estate, but the greater part remains in specie, as the same was conveyed to the trustees.

9. That he denies the complainant's allegation that Elizabeth Greenfield thought she was making a will; on the contrary, she desired to put her property out of her power.

10. That he admits the deed and declaration of trust were prepared by him. He does not know Mrs. Greenfield's age when she executed the papers; but till 1842 or 1843, when she was attacked with disease, she was a shrewd and intelligent woman.

11. That he admits the trustees took possession of the property mentioned in the declaration of trust.

12. That he denies the allegation of complainant, that the trustees refused to admit they were trustees. And the reason the said declaration was not put upon record immediately after its execution, was to prevent the many vexations to which the said Elizabeth Greenfield would otherwise have been exposed.

13. That the sum of one hundred dollars was not paid by the trustees to the said Elizabeth Greenfield, but there were considerations paid, namely, services rendered by Joseph Howell and respondent to Elizabeth Greenfield, from time to time, and future services were to be rendered.

14. That the sum of $10,000 each to the trustees for their services was fixed by said Elizabeth Greenfield; that she proposed to give more to respondent, which he declined; and Joseph Howell did not know any thing of the sum of $5000 reserved to him until after the papers were all prepared.

2 R

15. That he does not know of the debts being due by Elizabeth Greenfield which are mentined in complainant's bill.

16. That she sent to respondent a single bill, through the hands of Samuel W. Rush, for $5000, which he has never claimed. That at the same time, she made a similar bill in favor of the Rev. W. Suddards, for $6000.

17. Respondent admits that complainant claims to be a creditor of Elizabeth Greenfield.

18. That the account of the trustees was filed in the Court of Common Pleas on the 4th day of December, 1845. That the said court have appointed an auditor to settle the same.

19. That respondent has been advised and believes the said Elizabeth Greenfield could not revoke the said deed and declaration of trusts.

20. That he admits he received several notes from the counsel of complainant, and gave answers.

21. That the accounts were filed in the Common Pleas before he heard of this suit, and that he refused to furnish the accounts of trustees to complainant, because he had no right to demand them.

22. That there is deposited, in the name of the trustees, in the Farmers' and Mechanics' Bank, $3354.51, and that, as trustees, they hold 111 shares of the stock of said bank. That they have refused to pay the same to complainant.

And in answer to the said suplemental bill, the said John Bouvier says, 1. That the complainant did file his bill, and that it was demurred to.

2. That the trustees bought the bank stock in complainant's supplemental bill mentioned, but out of what moneys, whether principal or income, he cannot tell.

3. That there are one or two dividends unpaid by the said banks, which the trustees have not been able to get in consequence of the notice of the complainant to them that he claimed the same.

The will under which Dr. Anderson, the complainant, claimed, was dated the 8th day of August, 1843. He and Samuel Rush were appointed executors of it.

And another will was produced, in which it was said, "The intention of this my last will and testament is to dispose of the unexpended and uninvested balance of the income of my estates, real and personal, which may be in my own hand, or in the hands of any attorney, agent, trustee, or other person or corporation acting for me, or in my behalf."

This last was dated the 26th day of March, 1845.

Mrs. Greenfield died on the 9th July, 1845, aged about ninety-eight years.

Samuel W. Rush renounced his executorship by paper, dated August 25, 1845.

The case was heard upon bill, answer, replication, and deposi-

tions, before GIBSON, Chief Justice, who delivered opinion and decreed as follows, viz.:

Much the greater part of the evidence in the cause is irrelevant. All that relates to the actions of the parties subsequent to the execution of the deed of trust, has nothing in it that bears on the integrity of that transaction, except that Mrs. Greenfield habitually spoke of the instrument as her will; whence an argument that she was deceived in supposing that she was executing an ordinary will, and not an irrevocable instrument. But though she spoke of it as a will, she spoke of it as an irrevocable one; and, almost to the last, exulted in the belief that it was so. She knew she had made a posthumous disposition of her estate, and it was natural for a person ignorant of technical terms, to designate it as she did. Even Rush, a trustee, and privy to the whole transaction, called it her will. As to its being, in fact, a testamentary act, and therefore revocable, the argument is scarce worth an answer. 'Tis true, a deed containing a posthumous disposition has been proved as a will; but here the trust was not entirely posthumous, for the legal title was vested in the trustees, in order to let them manage the property in her lifetime, and to pay as much of the produce as she should desire into her hands. There was nothing testamentary in that. But according to all the proofs, the very object of resorting to a trust deed, was to make the disposition unalterable; and, if the owner of property cannot tie up his hands in regard to it by such an instrument, he cannot do it at all.

What objection, then, is there to the execution of the two instruments? It is charged that neither was read to her, nor the contents made known to her, prior to, and at the time of the execution of them, nor ever after, till the time of her decease; and it is said, that the charge is corroborated by the confidential relation in which one of the trustees stood to her, in connection with the exorbitant compensation reserved, and the provision for exempting the trustees from responsibility for their agents, or for each other. As compensation merely, the sum of $40,000 for managing an estate worth only five times as much, would be inordinate; but if she thought proper to give a princely recompense to those who served her, there could be no indelicacy in accepting it. Not a drop of her blood ran in the veins of any living creature; for the allegation of her consanguinity to the Rceses, and supposed attachment to them, has been entirely disproved, if any thing can be disproved. Indeed, it seems to have been their importunities principally, against which she sought protection. Now all the depositions show that she was generous to a fault; indeed, she seemed to have a passion for giving; and she might well give munificently to those who helped her to accomplish the closing object of her life, a settlement of her property, which would secure her from im$_k$ sition in her second childhood, and prevent litigation

about her property after her death, of which she spoke with fear and apprehension. Nor was this trust thought by others a thing to be coveted. Mr. Cowperthwait deposed that both he and Dr. Hulings declined it. But the amount of compensation was suggested by Mr. Rush, the colluding trustee; and it is clear that he, the husband of a member of the Rees family, and the father of another, did not think it too great. As to the disqualification of a lawyer to act in a trust about which he has been consulted professionally, I know nothing of it. His confidential relation can, at most, give cause of suspicion, which may be removed.

The circumstances at the execution of the trust deeds were such as usually attend such transactions. Unfortunately, Mr. Justice Baldwin and Alderman Pettit, the only two disinterested persons present, have passed away; but they have stamped the transaction with the impress of their high character. Foul play in the presence of Judge Baldwin could not have been successfully practiced, nor can it be successfully imputed; and we accordingly find that the bill does not directly charge either fraud, imposition, or misrepresentation. I am far from clear that it might not have been demurred to. If a party who can read, as Mrs. Greenfield could, will not read a deed put before him for execution; or if, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which, I take it, is not the subject of protection, either in equity or at law. At law, it certainly is not. "If the party that is to seal the deed, can read himself and doth not, or being illiterate or blind, doth not require to hear the deed read, or the contents thereof declared, in these cases, albeit the deed is contrary to his mind, yet it is good and unavoidable." *Touch.* 56. But, adds Mr. Preston, the editor, "Equity may correct mistakes, frauds," &c. For this he refers to Manser's case, 2 *Co.* 3 b, in a note to which there is a reference to Bennet *v.* Vade, 2 *Atk.* 324, which was the case, however, of a conveyance by a man on the verge of insanity, who had even been married at the instigation of others, without proposal made to him, or without being conscious that he was so; who had been cautioned by a friend not to sign papers; and who stood so much in awe of the grantee, that the bare name of the latter would reduce him to submission when he was furious. That was a case of undue influence. The principle of Mr. Preston is asserted also by Mr. Thomas, in a note to Thoroughgood's case, 2 *Co.* 9 b, for which he refers to Jones *v.* Crawley, *Finch's Rep.* 161, which was a case of positive misrepresentation; and to the Attorney-General *v.* Sothon, 2 *Vern.* 497, which was a case of compulsion; neither of which sustain the principle for which they were quoted; and the *dicta* of these respectable editors have to encounter authorities which bear the other way, without the benefit of adventitious aid. In an anonymous case in *Skin.* 159, one who could read, made an

[Greenfield's Estate.]

agreement for a lease for twenty-one years; the lessor drew a lease for one year, but read it twenty-one; and equity refused to relieve the lessee, because he could read and would not; and in this it certainly carried the principle of non-intervention a great way. But in Willes *v.* Jernegan, 2 *Atk.* 251, equity refused to relieve against a hard bargain made by a man with his eyes open, because there was no fraud. Nor will a party be relieved merely because he put an unguarded confidence in another: Langley *v.* Brown, *id.* 202. Now, if Mrs. Greenfield neither called for the deeds, nor inquired what the trustees were to have, she left them to make their own terms, and she was bound by it. Such a thing as fraud, imposture, or deceit, by them, is neither charged nor proved. The complainant relies exclusively on the abstract effect of the fact—if it be a fact—that the deeds were not read to the grantor at the time of execution, or the contents made known to her at any time before; yet as she could read and did not, my opinion is that the complainant be not relieved on that ground, without superadded proof of management and surprise.

Of all the persons present at the act of execution, John Bouvier, Joseph Howell, and Samuel W. Rush, alone survive, and can speak of what took place. Mary Richards, it is true, deposed that Mrs. Greenfield told her Judge Baldwin had read the deeds to her; but she was evidently mistaken, for the respondents do not allege in their answer that they were read then. Mr. Bouvier says they were produced by her, and their nature was explained to her by Judge Baldwin. Mr. Howell says that, being asked if she knew their contents, she replied that she knew all about them; but both say they had been in her possession for several days for examination. Mr. Howell further says that the clause for compensation was suggested, as he believes, not by the trustees, but by her. That she did not consider that she had been overreached in regard to it, is evident from the fact proved by the complainant himself, that she had subsequently made a voluntary offer of a sealed note to Mr. Bouvier of $5000 in addition. It will not do to say that this note may have been procured by an abuse of confidence, for Mr. Bouvier is too good a lawyer not to know that it was altogether worthless, as it could not prevail against the declaration of trust. Now, these answers of the trustees, though not evidence of any fact in favor of themselves, are nevertheless sufficient to rebut the whole charge in the plaintiff's bill, and to leave the proofs to stand on the depositions and exhibits. We have the affirmation of two of the surviving trustees against that of the complainant, which would be enough to satisfy even the Roman law. I say nothing of the answer of Mr. Rush, whose position in the cause is too equivocal to let his admissions be evidence against his co-trustees, even did not the general rule prevent it. But giving the complainant the benefit of his affirmation, the proofs on the pleadings

would stand in equilibrio; and how do they stand on the testimony of witnesses?' In vain do we look into it for a syllable on the subject, except the statements of Mary Richards already noted; and we are to presume foul play in the absence of proof of it! Long experience in these matters teaches me that a deed is very seldom read over to the grantor in the presence of the magistrate in attendance; nor is it usual to communicate the substance of it to the grantor, except in making the separate examination of a married woman. That is presumed to have been done before. Had the trustees insisted on having these deeds read to Mrs. Greenfield, deaf as an adder, I would have applied to them the spirit of Lord MANSFIELD'S remark, that he had never known a forged will which did not purport to have been executed according to the strictest requirements of the statute of frauds. The presumption of innocence in this case, casts the *onus* of proof on the complainant, and he has failed to sustain it.

But he insists that he is entitled to the profits of the estate and an account. I think it clear that he is not. In the declaration of trust, the respondents say "we will apply the income and profits thereof as the said Elizabeth shall direct; and for want of such direction, that we will invest the profits, after deducting all expenses, in some stock, or lend the same upon security; and that such sums shall be considered as under the same situation, and for the same trusts, as the property conveyed to us as aforesaid, and after the death of the said Elizabeth Greenfield, for the uses and purposes following, to wit," and they are then set down. She reserved a right to spend the whole of the profits in her lifetime; not to direct the application of them by will, an exercise of power on her part, she was anxious above all things to preclude. Had they continued to swell, as they did till they reached the amount of fourteen thousand dollars in the year immediately preceding the loss of half the estate in the stocks of the Mississippi banks, she would have had as much to bequeath, on the principle of the argument, as half of the original amount of the estate, and have been exposed to the importunities and impositions she so much dreaded. When the settlement was executed, she frequently spoke of it in a tone almost of exultation, that she was done with such dispositions for ever. But the trusts were to take up whatever was unexpended at her death; indeed it would seem that each annual surplus was to be invested as trust money in her lifetime. The complainant, therefore, is not entitled to either the profits or an account, in his character of administrator with the will annexed; and, if that were otherwise, the Common Pleas had acquired jurisdiction of the account at the filing of the bill.

Bill dismissed with costs; and it was decreed, that the bill of the said Matthew Anderson, administrator with the will annexed of Elizabeth Greenfield, be dismissed; and further, that the said com-

[Greenfield's Estate.]

plainant pay unto the respondents in the bill, the costs of this: suit.

An appeal was entered from the decree.

Subsequently, on the part of defendants, was produced a will of Mrs. Greenfield, dated the 17th of 10th month, 1807, and also another will of same, dated April 1st, 1824.

The case was argued by *C. Fallon* and *J. M. Scott*, on the part of complainant.—It was contended, 1. That the deed of 15th December, 1834, to Howell and others, if taken by itself, is void as to complainant.

2. That the deed, if taken in connection with the declaration of trust of same date, is also void as to complainant; or at least, they together constitute a *testamentary* disposition of property which is revocable, and has been revoked by the subsequent will.

3. That at all events, even assuming the deed to be valid in all respects, complainant is entitled to so much of the funds in the hands of the grantees, as arose from the *income* of the estate purporting to have been conveyed.

4. That the bill should not have been dismissed with costs.

Under the *first* point, it was contended that the deed was void as to complainant, at least without some evidence to sustain it, on the ground that the two grantees who it was alleged procured the making of it, stood in fiduciary relations to the grantor; the one, Joseph Howell, being her confidential adviser, the other, Judge Bouvier, being her legal counsel and attorney, having drawn her previous will, and having in that capacity been employed about and drawn the deed, she having previously, at the instance of Mr. Howell, consulted with Mr. Bouvier in relation thereto : *Story's Equity*, sec. 308-9-11; 1 *Cox Rep.* 125; 13 *Vesey* 137.

The burthen of establishing its fairness and adequacy, is thrown upon the attorney: *Story*, sec. 312; 2 *Vesey* 627; 4 *Dessausure* 678-9; 1 *Ball & Beatty* 105-6; 2 *B. & B.* 89; 15 *Vesey* 34; 14 *id.* 273.

There is no evidence that the deed was read to Mrs. Greenfield, and if it had been, it should also have been explained: 2 *Atkyn* 202; 3 *Peere Wms.* 130; 9 *Vesey* 292; 12 *id.* 376; 2 *Sch. & Lef.* 492; 2 *Vesey* 199; 14 *id.* 91.

That Mrs. Greenfield thought she was executing a will, and the deed and declaration of trust should be considered as a testamentary disposition and as revocable: 2 *Ves. Sr.* 440-591; 2 *Haggerty* 247-554; 4 *id.* 356; 1 *Jarmin* 12.

The deed and declaration being executed simultaneously, the deed was not valid till the declaration was recorded: 17 *Ser. & R.* 70; 4 *Watts* 134.  She was indebted at her decease.

At all events, the executor is entitled to the income unexpended

at the decease of Mrs. Greenfield: 2 *Watts* 188; 6 *Coke* 17; 3 *Bac. Abr.* 387; 1 *Dal.* 148.

That defendants should pay the costs: 15 *Vesey* 34.

*H. M. Phillips* and *W. B. Reed*, with whom was *H. J. Williams*, for Howell and Bouvier.—Mrs. Greenfield was legally competent to make such a settlement, and had sufficient intellect to do so.

The instruments were executed in form, and the deed transfers the whole estate. She understood their effect, she knew that they were not a will; she had made wills before. She was informed by Judge Baldwin of the nature of the instruments.

The estate was taken possession of by the trustees, and the income received for years. They are not void because *voluntary.* The authorities cited in 2 *Story's Eq.* sec. 973; 4 *Kent* 282, and 1 *Ves. Jr.* 53, were cases of *imperfect* agreements. In this case, no aid is asked of a court of equity. The title at law is perfect. When a money consideration is stated in a deed of bargain and sale, no averment is to be received to the contrary: 1 *Bin.* 518–19; 2 *Ph. Ev.* 761; *Robb on Frauds* 119.

No *fraud* is proved: 13 *Ser. & R.* 434. The English rule, from which ours has been adopted, is founded on the statutes of 13 and 27 Eliz. The former avoids instruments made to delay, hinder, and defraud creditors; the latter to protect purchasers; but in both cases, *fraud* is the test. *Voluntary* settlements by one not indebted, are not void: 2 *Br. Ch. C.* 90; 5 *Vesey* 384; 12 *id.* 148, 136.

They are valid as to *subsequent* creditors: 8 *Mees. & Wels.* 405; 4 *N. Hamp.* 229; 1 *Marshall* 582; 8 *Wheaton* 229–242; 11 *id.* 211.

The presumption is that a party executing and acknowledging a sealed instrument, is acquainted with its contents, and parol declarations cannot be received to substitute another contract for it. It was not necessary to prove that the deed was read to the grantor, unless it was required by her: 2 *Johns. Rep.* 404; 5 *Bos. & Pul.* 415; 1 *Nev. & Man.* 576.

The instruments were not *testamentary* papers, and were *not revocable.* 1. They purport to be made *inter vivos*, and to take immediate effect. 2. They did take effect by delivery of the deeds and the management of the estate. 3. That provisions are made in them for action *during the life of Mrs. Greenfield.* 4. That these provisions were complied with for ten years. 5. They were complete; there was no control retained by Mrs. Greenfield, and no power to appoint by will, and nothing to show an intention to retain any power over the estate, except over *its income.* It is not so much the *form* of the instrument which distinguishes a will from a deed, *as the time of its intended operation*: 1 *Jarman* 16–17–18; 3 *Price* 368, Attorney-General *v.* Jones; Thompson *v.* Brown, 3 *Myl. & Keen* 32, 8 *Eng. Ch. Rep.*; 2 *Kelly's Geo. Rep.* 32–6; 3 *id.* 569–574; *id.* 460–484; 4 *Hawkes* 141–171.

[Greenfield's Estate.]

As to the compensation, it was not inordinate. That at the date of the deed, Mrs. Greenfield supposed that she was worth about $227,000. She had no blood relations. Nothing was to be paid to the trustees until after her death. It was not invalid because made partly *in favor of counsel*, there being no fraud existing: 1 *Story's Eq.* sec. 312; 9 *Vesey* 292, Hatch *v.* Hatch; 13 *Vesey* 137; 12 *id.* 376; 14 *id.* 273.

The fact of the declaration of trust not being recorded during the lifetime of Mrs. Greenfield, does not affect its validity. As between grantor and grantee, the recording acts have no operation, nor between legatees and *cestui que* trusts: 1 *Whar. Dig.* 452, *Deed, pl.* 54–55–63.

The answer of Mr. Rush, one of respondents, is not evidence against the others: 12 *Vesey* 361. Rush was interested to support the will.

The opinion of the court was delivered by

BELL, J.—After much reflection, and a critical examination of the voluminous evidence and exhibits with which the case is loaded, we entirely agree with the Chief Justice, in his general estimate of the transaction in question. Any difficulty which may have retarded the announcement of our conclusion, has arisen, not from a doubt of the validity of the disposition made by Mrs. Greenfield, considered in its general aspect, but from hesitancy as to the light in which a particular feature of it ought to be regarded.

The original conveyance to trustees and the deed declaratory of the trusts, are to be accepted as one transaction: Hamilton *v.* Elliot, 5 *Ser. & R.* 384; Cromwell's case, 2 *Rep.* 75; and, consequently, the interests of the parties claiming under them, and the rights of those who impeach them, are to be considered precisely as though the two instruments constituted but one muniment of title. Conceding the creation of it to have been purely voluntary, the competency of Mrs. Greenfield to make it is beyond cavil. To say nothing of the valuable consideration mentioned in the conveyance itself, the perfect right of a proprietor to divest himself of his estate by way of gift, uninduced by pecuniary consideration, is among those which do not admit of question, and when such a gift is executed or otherwise fixed in the beneficiary, either by the direct conveyance of an estate or the creation of an use, it is beyond the power of the donor or his representative to revoke it. Settlements like that before us, reserving a present interest in the creator of them, and carrying a future benefit or bounty to other designated parties, are very usual. If fairly made and carried into effect, uninfluenced by fraud or circumvention, they cannot be subsequently impeached, as is shown, among other determinations, by our own case of Ruth *v.* Reese, 13 *Ser. & R.* 434. The authorities cited for the plaintiff as hostile to this position, look only to un-

executed covenants or agreements to raise future trusts, by way of gift, which equity will not enforce, if founded in mere benevolence, or a purely moral obligation.

Nor is this transaction open to impeachment on the ground that it is in fraud of creditors. At the time of its inception, Mrs. Greenfield was of ample fortune, very far beyond any amount of debt for which she was liable. Indeed, there appears to have existed, at that time, but a single debt, and for this provision was made. Those averred to have been since created, cannot be invoked in aid of this attempt to invalidate the arrangement, for a voluntary settlement of an estate, made by one unindebted at the time, or who reserves sufficient to pay all existing debts, cannot be successfully attacked by subsequent creditors, unless, indeed, there be something to show the settlement was made in anticipation of future indebtedness. I know some doubt was thrown upon the soundness of this principle by Thomson *v.* Dougherty, 12 *Ser. & R.* 448; but it was afterwards dissipated in Mateer *v.* Hassin, 3 *P. R.* 160, supported by a multitude of cases cited for the defendants on the argument.

Neither is there the slightest pretence for saying the settlement must be accepted as a testamentary disposition, or that the donor was unduly induced to give it effect under the erroneous idea that it was a last will, or something in the nature of one. That it is not so, in fact, is abundantly shown by the reasons given at *Nisi Prius*, in corroboration of which, numerous authorities might be adduced. It may, however, suffice to refer to Thompson *v.* Brown, 3 *Mill & Keen* 32; and the concurring American cases of Hester *v.* Young, 2 *Kelly* (*Geo.*) *Rep.* 31–46; Jackson *v.* Culpeper, 3 *Kelly* 569–573–574; Cumming *v.* Cumming, *ib.* 460–484; and Allison *v.* Kurtz, 4 *Hawkes* 141–171. These settle the difference to be not in the form but effect of the instrument used, which, if it convey an estate *in presenti*, cannot be a will, for that operates only *in futuro*. The subject is well discussed by Mr. Jarmin, in his treatise on wills, where it is shown the true principle is that ascertained by Thompson *v.* Brown. That case, in the particular under consideration, is identical with the present. As was well observed at the bar, the instruments here in question, purport, first, to be made *inter vivos*, and to take effect immediately; second, that they did take effect immediately, by the delivery of the deeds and the transfer of the whole estate; third, that provision was made in them for the action of the trustees during the life of Mrs. Greenfield; fourth, that those provisions were executed for ten years; and, fifth, that the instruments were complete, and calculated for instant operation. All of these features are utterly inconsistent with the aspect of a purely testamentary disposition, and therefore disprove the deeds in question, as belonging to that class.

There is no evidence in the cause, upon which reliance can be

placed, as showing the belief of Mrs. Greenfield, at the moment of execution, that the documents submitted for her acceptance were testamentary, and therefore revocable.   The proof is, she was acquainted with the nature of testamentary dispositions, having executed at least two wills before that time ; that she became dissatisfied with the liability to solicitation and the consequent annoyance to which the revocable nature of these exposed her ; that to escape from this, and by way of protection even against herself, she desired to make an irrevocable arrangement of her affairs, and that, with this view, she perfected the disposition of which she afterwards spoke as unchangeable by any mere exertion of her desire. It is true, that she sometimes referred to it as her "will."   But as it was to be chiefly operative after her death, it is not at all surprising one unacquainted with the strict import of the term, should occasionally misapply it, when referring to documents which dealt largely in posthumous gifts.   Yet, certain it is, that she frequently alluded to it, as being unalterable "as the laws of the Medes and Persians," and seemed to exult in that fact, as her protection against imposition and obtrusive importunity.   It is also true, that after the conversation with Charles Roberts, in which he reproached her with extravagant expenditure, she seems occasionally to have entertained a desire to revoke the prior arrangement, and *to resume the full dominion* of her property.   But there is evidence that these expressions of impatience were made during moments of excitement, probably induced by the remarks of interested persons calling into question the action of the trustees, and thus prompting an enfeebled intellect to a suspicion that those in whom she had trusted were exerting an improper exercise of the power vested in them.   Yet, even in her conferences with Mr. Gilpin relative to the testamentary paper afterwards executed, she recognized the then distasteful fact that she had relinquished the command of her property, by the expression of her dissatisfaction with the existing condition of her affairs, and of her desire to resume the absolute control of them, with a view to a new disposition. This, while it certainly indicates present discontent, seems to point unerringly to prior knowledge of the nature of the disposition already made.   Indeed, without wading through it in detail, I may indicate the tendency of the mass of the testimony on this point, by saying that, in my apprehension, it establishes both Mrs. Greenfield's intention to make a final disposition of her estate, and her knowledge that she had done so.   Whether her subsequent discontent was created by the practices at which I have hinted, or was the result of spontaneous repentance, it is almost needless to remark, it was impotent to destroy the trusts she had created, even though her desire to do so was manifested by her execution of the testamentary paper prepared by Mr. Gilpin.

After what has been said, a few words will suffice to dispose of

[Greenfield's Estate.]

the objection that the deeds creating the trusts were not read to her, at or before the time they were executed; treating the objection as applicable to all the dispositions made. The general rule is, that a party executing a legal instrument is presumed to be acquainted with its contents. Where it is of ordinary import, unconnected with suspicious circumstances, and uninfluenced, actually or presumptively, by the peculiar relation subsisting between the maker of it and the party to be benefited by it, the burden of disproving the presumption lies on him who would impeach the deed. Nay, the authorities show that, usually, if one who is about to execute an instrument can read it, and neglects to do so; or being blind or illiterate, chooses to act without requiring the contents to be made known to him, he will be bound to it, though it turn out to be contrary to his mind: *Touch.* 56; Hollenbeck *v.* Dewitt, 2 *John. R.* 404; King *v.* Longnor, 1 *Nev. & Man.* 576. Doubtless, a fraud, actively practised upon a party so situated, would vitiate his act, and it has been made a question whether, in an ordinary case, equity would correct a mistake in a deed so executed? If so, most certainly a chancellor would not interfere except upon distinct and convincing proof of the alleged mistake, by him who averred it. So far as the general disposition of this estate is involved, I perceive nothing to withdraw it from the operation of the ordinary rule I have stated. In this aspect, it presents an instance of one who, possessed of wealth but destitute of relatives, was desirous to provide for the future disposition of her estate among those whom, during a long and active life, she had regarded as friends. So far as appears, this was effected without the slightest improper interference by them, or any thing to induce the most remote suspicion of undue influence or unfair practice. No whisper of it has been heard in the proofs. Indeed, so far as the general beneficiaries are concerned, the deeds are unassailed upon this ground. Nor is there any room for the suggestion of incompetency from imbecility of intellect. The evidence shows she was capable of comprehending the contemplated distribution of her estate, and the presumption is she did understand it, at least to the extent of the dispositions in favor of persons not parties to the deeds.

The Chief Justice was of opinion, at *Nisi Prius*, that those clauses of the declaration of trust which propose to reserve certain sums to the trustees are protected and sustained by the same principle. But further examination and reflection have satisfied him that, in this particular, he fell into an error; and I am authorized to say that he concurs with his brethren in thinking those clauses stand on a distinct foot, and are to be measured by a different rule.

The deeds were prepared by Mr. Bouvier, who, for some time prior, had been the legal adviser and confidential attorney of Mrs. Greenfield. In this instance, he acted upon the express suggestion

[Greenfield's Estate.]

and recommendation of Mr. Howell, in whom the donor reposed
the most implicit faith.   It is evident, both these gentlemen exer-
cised over her an almost unbounded influence, and were thus
enabled to give direction to her thoughts and actions.    Mr. Rush
also stood towards her in a fiduciary relation; and the fourth trus-
tee, Mr. Roberts, was brought into the business by Mr. Howell,
under a recommendation well calculated to command her utmost
trust.   For a considerable time before the conveyance, it is proved
she was improvident, if not extravagant, in the expenditure of her
fortune, and, in reference to it, singularly open to solicitation and
importunity.   In the language used at *Nisi Prius*, she was gene-
rous to a fault, and seems to have been haunted by a passion for
giving.   While indulging this inclination for expenditure, the deeds
in question were made.   By these is reserved to the trustees the
sum of $40,000, being $10,000 to each, professedly as compensation
for assuming the burden of a trust which might have been termi-
nated in a year; and, according to every probability, would not
endure for a very long period.   As a reward for the future manage-
ment of an estate worth, at the utmost, only five times as much,
the sum named has been well designated as inordinate.   Yet this
fact will by no means justify a charge of actual fraud against the
parties who principally managed this transaction.   As already
intimated, there is no proof in the cause to warrant so grave an
accusation, especially of individuals enjoying the eminent reputa-
tion which all accord to these trustees.   I can very well imagine
how, without a violation of conscience, they might conceive them-
selves entitled to a princely remuneration, under the circumstances
then surrounding the donor.   But in spite of this concession, a rule
of public policy and pure morals, founded in long experience of the
human heart and knowledge of man's cupidity, interposes to forbid
an allowance of the claim.   In this feature, the case presents what
is called a constructive fraud, springing from the confidential rela-
tions existing between the parties.   This peculiarity, withdrawing
it from the operation of ordinary rules, throws upon the beneficiaries
the duty of showing expressly that the arragement was fair and
conscientious, beyond the reach of suspicion.   In requiring this,
courts of equity act irrespective of any admixture of deceit, imposi-
tion, overreaching, or other positive fraud.   As it has often been
said, the principle stands independently of such elements of active
mischief.   It is founded upon a motive of general policy, and is
designed to protect a party, so far as may be, against his own over-
weening confidence and self-delusion, the infirmities of a hasty
judgment, and even the impulses of a too sanguine temperament.
It has been beneficially applied to those confidences which owe
their birth to the relation of parent and child, guardian and ward,
trustee and *cestui que trust*, and, above all, attorney and client.
To guard against the strong influences which these connections are

so apt to originate, the law not only watches over the transactions of the parties with great and jealous scrutiny, but it often declares transactions absolutely void, which, between other parties, would be open to no exception. This is emphatically true of the relation of client and attorney, and to persons standing in a situation as *quasi* guardians or confidential advisers. Many of the cases establish the doctrine that, while these connections exist in full vigor, the adviser shall take no benefit to himself, from contracts or other negotiations with the advised: (Hatch v. Hatch, 9 *Vesey* 297; Wood v. Downes, 18 *Vesey* 126; De Montmorency v. Devereux, 7 *Clark & Finelly* 188:) a doctrine intended to supersede the necessity of any inquiry into the means used or the exertion of influence in any particular case, which is often difficult, if not impossible from the very nature of things: Welles v. Middleton, 1 *Cox R.* 125; Wright v. Proud, 13 *Vesey* 137. Other authorities, where the transaction is one of contract and sale, conceding that it may not be absolutely void *ipso facto*, throw upon the agent the burden of establishing its perfect fairness and adequacy, and that it was the deliberate act of the confiding party, after being fully informed of his rights, interests, and duties, and put upon his guard against even the suggestions of his own inclinations. It must appear affirmatively that no advantage has been taken of the client; and if this be not absolutely established *uberrima fide*, equity will treat the case as one of constructive fraud. An attorney, or other confidential adviser, is not permitted to avail himself either of the necessities of his client, or of his good nature, liberality, or credulity, to obtain undue advantages, bargains, or gratuities; and it has been said, there would be no bounds to the crushing influence of the power of an attorney who has the affairs of a man in his hand, if it were not so: Gibson v. Joyes, 6 *Vesey* 278; Montesquieu v. Sandys, 18 *Vesey* 313; Jones v. Thomas, 3 *Y. & Coll.* 498. A judicious writer on this subject has observed, that equity "does not so much consider the bearing and hardship of this doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influence arising from the confidential relations of the parties." 1 *Story's Eq.*, sec. 311.

Where the question agitated is of a gift, the rule would seem to be more stringent than where the advantage flows from a contract or mutual arrangement. In Wright v. Proud, Lord ELDON said, an attorney shall not take a gift from his client while the relation subsists, though the transaction may be not only free from fraud, but the most moral in its nature; a *dictum* which Lord BROUGHAM observed was afterwards reduced, in Hatch v. Hatch, to this, that it is almost impossible for a gift from client to attorney to stand, because the difficulty is extreme of showing that every thing was voluntary and fair, and with full warning and perfect knowledge:

Hunter *v.* Aikens, 3 *M. & Keen* 113; and see Edwards *v.* Meyrick, 2 *Hare R.* 60–68.

This well considered and well settled doctrine is to be applied here. Under its operation it is impossible the declaration in favor of the trustees should stand. At the date of the transaction the creator of the trust was a very old woman, in a great measure dependent for advice and direction in her pecuniary affairs upon those in whom she placed her confidence. Unacquainted with legal forms and unused to the transaction of legal business, it is highly improbable she could have made herself acquainted, without assistance, with the long, dry, and tedious details of the two deeds, though they might have been left with her for several days, as the answers aver. No one of those who constantly surrounded her ever saw her perusing them, or in any way attempting to master the contents; and there is no shadow of independent proof that any one offered to assist her in this irksome task. To be sure, two of the answers allege, in substance, that the deeds were read to her by Mr. Bouvier, and that at the time of their execution, either Judge Baldwin or Alderman Pettit explained to her the nature of them. On the other hand, Mr. Rush, in his answer, positively avers the papers were neither read nor explained to her; Judge Baldwin having expressly declined to do so. But were we, after a general replication, at liberty to accept the two first answers as proof, they do not go far enough. I think it may be said, without hazard of error, that to uphold such a claim as is made here, by these trustees, it is not enough to show, generally, that the instruments were read to the party, or to aver broadly that the contents were explained to her, or that she admitted her knowledge of them. Under the wholesome rules I have brought to view, at the very least it ought to be proved the attention of the party was called to the very provision, with full and candid explanations of its character and effect; and that, after taking it into her "fair, serious, and well informed consideration," she assented to it uninfluenced by those who are to be benefited by it. In saying this, I have borrowed the idea of Lord ELDON, and quoted some of his language in Hatch *v.* Hatch, when speaking of a gratuity, by way of remuneration, offered by an emancipated ward to his late guardian, for the care and labor exerted in the management of his estate; and he added: "But the court cannot permit it, except quite satisfied that the act is of that nature, for the reason often given; and recollecting that in discussing whether it is an act of rational consideration, an act of pure volition uninfluenced, that inquiry is so easily baffled in a court of justice; that instead of the spontaneous act of a friend uninfluenced, it may be the impulse of a mind misled by undue kindness, or forced by oppression, &c. And, therefore, if the court does not watch these transactions with a jealousy almost invincible, in a great majority of instances

it will lend its assistance to fraud." These remarks are full to our purpose. Looking to the whole case, as it is presented by both proofs and pleadings, the questions may be asked, was Mrs. Greenfield aware that by the terms of the declaration, her estate was to be burdened with the payment of $40,000 as compensation to the trustees? Did she know that this sum was payable though each of the trustees might decline the burden of the trust within a year after its creation? She might have been acquainted with the first provision without being cognizant of the last, for they are widely separated in the deed. Who shall say it was not so? And yet to sustain them, I repeat it must be clearly established she not only knew of, but comprehended both, thoroughly. The answers, at most, aver that she suggested the amount of compensation her-self; but was she made aware of the clause under which it might be reduced to a mere gift? It is extremely difficult to believe she understood and deliberately assented to this. The doubt is suffi-cient to invalidate the provision. It was said, on the argument, that all the cases in which donations and gratuities were disallowed, are either cases where no service was rendered, or of past services, which, it is thought, differ in principle from those where the services are prospective. I am not aware of any instance in which this dis-tinction is taken. But, as in our case, the declension of all service and responsibility was optional with the trustees, I am disposed to regard the sums dedicated to them rather in the light of a gift than as payment, and to submit it to the rigidity of inquisition to which such gifts are always exposed. Under such a scrutiny, it must necessarily fail. The trustees acting in this matter through Bouvier, as their representative, who himself was the attorney of the donor, they all stand in the category of confidential advisers who have attempted to secure a benefit to themselves, through the influence appertaining to their confidential positions. It is impos-sible to discriminate between them. Each is so intimately de-pendent on the others, that the fall of one necessarily drags down all.

Before concluding this part of the case, I ought perhaps to no-tice that something was said, on the argument, about a subsequent confirmation. But Morse *v.* Royal, 12 *Vesey* 373, shows that in these cases, an asserted confirmation is regarded with the same spirit of jealousy as attaches upon the original transaction, and that it is required to stand upon the clearest evidence. Of con-firmation, in the particular under consideration, we have not the slightest testimony. Indeed, it is not asserted the old lady ever saw the papers after they were executed.

This conclusion necessarily leads to an inquiry as to the legal effect of a decree declaring invalid the trust created in favor of the trustees. Does it invalidate the whole transaction? This has not been insisted, and I am unaware of any reasonable ground upon

[Greenfield's Estate.]

which it can be pretended that such a decree ought to affect innocent third persons, whose interests, under the deeds, are distinct from and independent of those claimed by the trustees as beneficiaries. As we have seen, very different considerations are applicable to these several interests, and the rights flowing from them are to be measured by very different rules. Each may stand without the other, and thus the declaration of trust may be established in respect of those dispositions not obnoxious to an avoiding principle, while those entitled to a less favorable construction may be declared void. This power of discrimination is entirely within the province of a court of equity, where a trust is divisible into distinct parts. In the exercise of a sound discretion, regarding distinct individuals as independent parties, it may uphold all of a transaction free of the taint of fraud, actual or constructive, while it decrees the destruction of those portions of it open to such an impeachment.

In denying to the defendants the specific sums ascertained by their declaration, we do not mean to say they are entitled to no compensation for their care, labor and responsibility in the management of the estate committed to them. This we leave to be ascertained, as in other cases of trust, by the proper tribunal.

It is unnecessary to add any thing to the reasons given at *Nisi Prius*, for denying the plaintiff's claim to the profits of the estate which have accrued since the death of Mrs. Greenfield. It suffices to say, we entirely concur in that reasoning and the conclusion to which it conducted the court below.

February 22, 1851, decreed as follows: This cause having been argued by counsel for the parties, and their respective proofs and allegations having been read and heard, the Court do order and decree, that the decree dismissing the plaintiff's bill with costs be reversed; and do further order and decree, that the indenture, dated the 15th day of December, 1834, recorded, &c., made between Elizabeth Greenfield of the one part, and Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, of the other part, together with the deed poll of same date recorded in deed book, &c., executed by the said Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, declaratory of the trusts upon which said first-mentioned deed was executed and delivered, constitute but one transaction, and are to be held as but one instrument of writing, and sufficient to pass to and vest in the grantees in the first-mentioned deed, all the estate real and personal therein purporting to be granted and conveyed, together with all the arrears of the rents, interest, dividends, income, and accumulation thereof, whether already received by and in the hands of said grantees, or are still due and unpaid, save that so far as respects the third clause or paragraph of the fifth item in said last-mentioned deed or declaration of trust, which is in the words

2 s 2

[Greenfield's Estate.]

following, to wit, "To pay to each of us, the said Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, the sum of $10,000 for our services, and after paying all the above," and the provision in said clause or paragraph made in favor of said Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush, be, and the same are hereby declared void, and it is ordered and decreed that said clause or paragraph, as well as all other parts of the said deed or declaration of trust, as refer to the payment in said clause or paragraph mentioned, be cancelled and struck out of said deed or declaration of trust; and that the compensation to which the said Joseph Howell, Charles Roberts, John Bouvier, and Samuel W. Rush may be entitled for their care, labor, and responsibility in the management of the estate committed to them, be left to be ascertained by the proper tribunal as in other cases of trust.

The question of the payment of the costs which have accrued in this proceeding, is reserved for the further order of the court, and the prothonotary is directed to tax the same, and ascertain the amount thereof, distinguishing the costs which have been made by the plaintiff and defendants respectively.