General Refrigerator and Store Fixture Company
*v.* Fry, Appellant.

16

Argued April 30, 1958. Before Jones, C. J., Musmanno, Arnold, Jones and Cohen, JJ.

*Maximillian J. Klinger* and *Theodore R. Mann,* for appellants.

*William A. Goichman,* with him *Max A. Daroff,* for appellee.

Opinion by Mr. Justice Musmanno, May 26, 1958:
Edward Mueller of Philadelphia sought a loan of $5,000 from David Fogel, owner of the General Refrigerator and Store Fixture Company of the same city. When Fogel refused to lend the money unless Mueller could supply surety, Mueller prevailed upon a friend, Wm. O. Fry, to sign, with him,[*] a judgment note in the sum of $6,750. Mueller then asked Fogel to make out two checks, one for $2,504.50 payable to Mueller and the other payable to Mueller and Fry in

---

[*] Both wives also signed the judgment note.

the amount of $2,495.50. Later, Mueller returned to Fogel with the two checks, the $2,495.50 one purportedly having been endorsed by Fry. Mueller asked Fogel to sign his name to the checks so they could be cashed since the bank knew Fogel but did not know Mueller. Fogel so signed the checks and Mueller cashed them but gave none of the proceeds to Fry, his signature, as well as that of his wife's, having been forged.

Fogel recorded the judgment note, Mueller absconded, and Fry was left holding the fi. fa..

Fry refused to pay the amount of the note, which was assessed at $7,777.85. Later, by stipulation, the amount was reduced to $6114.28. Fry contended that, since he was a payee on one of the checks but received none of the $5,000, a failure of consideration resulted and he, therefore, was not liable on the note. He accordingly filed a petition in the Court of Common Pleas of Philadelphia to open the judgment. The petition was granted but later rescinded by the court and judgment confirmed in the name of Fogel in the amount indicated. Fry appealed.

From the time that man learned to communicate thought by means of writing, he has been expressing approval of things which he later repudiated. Whether he chiseled his name to a stone, scribbled it on parchment, or penned it to twentieth century bond paper, he has found reasons to regret his signature and has appealed to some tribunal to be excused from the obligation he voluntarily assumed. Thus William Fry asserts that he is not liable under the judgment note because he signed as an obligor and not as a surety. But the court below found, from depositions which were taken, that Fry never expected to receive any of the proceeds of the two checks. Therefore, it was of no consequence that his name had been unauthorizedly added to one of the checks as payee. The court con-

cluded, from all the evidence, that Fry signed the judgment note as an accommodation maker and was responsible for the face value of the note since the original obligor had failed to honor the primary obligation.

Fry asserts on this appeal that he had many defenses to the note: (1) that he did not know what he was signing; (2) that the judgment note was blank when he signed it; (3) that in any event he could not be regarded as an accommodation maker since his name appeared on one of the checks as payees and his name was forged to the check; (4) that Fogel was negligent in the entire transaction.

We believe that the learned court below correctly diagnosed Fry's complaint when it said: "There was no allegation of fraud and no testimony was taken in regard thereto. In capsule form, this is a simple case of an accommodation maker trying to raise a defense of lack of consideration. The really basic complaint of the Frys is that they were not aware of the full legal significance and effect of that which they were signing; however, the law affords no relief therefrom even if this were averred in the petition."

Although Fry did not dispute his signature to the judgment note, he testified that he was unaware that the paper he signed was a judgment note. At first he asserted that the blank lines on the note had not been filled in when he attached his signature to the document but later he declined to say "positively" that the blanks had not been filled in. The most that he could assert with assurance was that the note carried no date. He admitted that though he could read, he had not read the instrument but merely "glanced" at it. This is rather thin ice on which to skate to the shores of non-liability. We said in *Commonwealth, to use v. Gudaitis et al.*, 323 Pa. 110, 111: "As long ago as when

Sheppard's Touchstone was written (1648), the law was as follows (page 56) : 'If a party that is to seal the deed can read himself and doth not, or being illiterate or blind, doth not require to hear the deed read or the contents thereof declared, in these cases albeit the deed is contrary to his mind, yet it is good and unavoidable.' In language not quite so quaint, we repeated this principle in Greenfield's Est., 14 Pa. 489, 496, adding that one who so signs a document 'is guilty of supine negligence which . . . is not the subject of protection, either in equity or at law.' We have never deviated from this ruling, one of our latest cases being O'Reilly v. Reading Trust Co., 262 Pa. 337, 343."

The whole business structure of America would become a shambles if signers in serious transactions were to be allowed to repudiate their obligations on the basis that they did not know what they were signing. The ever-constant possibility of such a disavowal would turn into water the adhesive mortar of legal responsibility holding together the bricks of every contractual wall; such an accepted possibility would wreck every business dealing at the slightest touch of the repudiator.

And then, it was not established in the case at bar that Fry did not know what he was signing. He testified that when he signed the note he took for granted that "it was a *reference for a loan.*" (Emphasis supplied.) He testified further: "What was the reference supposed to be for? A. To borrow money. Q. Why was he borrowing money? A. I don't know. Q. Are you related to him? A. No. Q. Are you a friend of his? A. Yes."

When asked if he was seeking a loan from Fogel, Fry replied: "No. If I wanted to get a loan—it was my corporation—I could go to a bank and make a loan as far as that goes. As I said, I never heard of this Mr. Fogel or the General Refrigerator and Store Fix-

tures Company, and I am sure I would not have gone there. I know other people who I could go to to get a loan if I needed one."

As the lower court indicated, Fry has not averred any fraud. A review of the entire record establishes quite clearly that Fry got himself into his present troubles through what this Court has already well denominated as "supine negligence." The person who willingly lies down so that others may step on him will have a difficult time convincing the world that he has not contributed in large measure to his own misfortune.

Even so, we believe that since the Frys were only sureties and received no part of the loan of $5,000, the costs in the case should be divided equally between the appellants and the appellee. Thus, with that qualification, the judgment is affirmed.