# Ralston et ux. *v.* Philadelphia Rapid Transit Co., Appellant (No. 1).

*Negligence—Release of damages—Contradiction of written instrument—Evidence—Clear, precise and indubitable—Fraud—Incapacity of claimant—Failure to read paper—Dealing with agent of company — Bargaining or negotiating settlement — Reasonable doubt—Trial judge as chancellor—Burden of proof—Stare decisis.*

1. Where, in a negligence case, defendant sets up a release of damages executed by plaintiff, and the latter seeks to have the jury disregard it, and the essential facts in regard to its execution are in dispute, the burden is on plaintiff to prove the facts upon which he relies, beyond a reasonable doubt, by evidence which is clear, precise and indubitable, and by witnesses who are credible, who distinctly remember the facts to which they testify, and narrate the details exactly.

2. The requirement that the statements of the witnesses must be indubitable, or true (so far as the appellate court is concerned with its application to the preliminary consideration of the evidence by the court, to judge of its sufficiency to go to the jury), simply means that, disregarding counter attacks on plaintiff's proof, such statements must have the appearance of truth at least to the extent of being free from manifest inconsistencies, or marks of inherent unreliability; of course, every slight departure or variation in testimony will not condemn the proofs as insufficient. The trial judge, in such cases, in passing upon the sufficiency of the evidence to measure up to the required standard, acts as a chancellor.

3. The question whether the proof meets the required standard is always a matter of law for the court, and only when it does so, is its truthfulness to be submitted to the jury. This rule applies alike in cases of alleged fraud in procuring the release or in taking advantage of plaintiff's alleged incapacity at the time he executed the release, and is particularly applicable if he is a mentally capable man of affairs.

4. One such as just described, who can read a paper put before him for his execution, or has an opportunity to get others to read it for him, and does not do so is guilty of supine negligence, which is not the subject of protection either in law or equity.

5. Such a person cannot be heard to say that he was not permitted to or did not or could not read it, or that he did not understand or was mentally incapable of understanding its contents (except where in the latter case he shows an impaired mentality),

unless by false representations, trick or fraud, calculated to deceive a man of his intelligence, and definitely and distinctly established, he was hurriedly misled into signing it without reading; and this is especially so where he knew that he was dealing with a representative of defendant, who was trying to negotiate a settlement, and the amount subsequently paid was approximately the sum originally claimed by plaintiff and was reached as a result of bargaining.

6. Where plaintiff's evidence shows that he deliberately falsified certain material facts, or that he cast doubt upon the disinterestedness of his recollection and the exactness of his statements, his evidence is not of the standard required to justify its submission to the jury as sufficient warrant for setting aside a solemn written statement.

7. To justify submission of such case to the jury, it must appear also that the false representations induced the execution of the release.

8. In an action against a street railway company by a husband and wife to recover damages for personal injuries suffered by the wife, defendant set up as a defense a release executed by both plaintiffs in presence of defendant's agent and another disinterested subscribing witness, not produced at the trial. The facts set up by plaintiffs, but mostly denied by defendant, were in effect that on the morning following the accident the husband informed defendant of the accident. A few hours later a claim agent of defendant called at plaintiff's residence and in the presence of the husband took a written statement from the wife in which a claim was made against defendant for the sum of $25 to cover damages suffered by reason of the accident. When upon the stand, the husband more than once denied that any such claim had been made, asserting he was "positive about that," also saying he was "positive" the subject of a settlement was not even discussed at the time, or until the third visit of the agent. He also emphatically denied that his wife had signed any statement whatever concerning the accident; but, when shown the writing containing his own signature as a witness, he retracted his former testimony, with the excuse that the matter had been so long ago he could not remember. He did not allege any irregularity in connection with the procurement of this paper. The testimony of the husband and wife was all that was offered as to the subsequent execution of the release, and they differed from each other in several material respects. The release was executed seven days after the accident, after several visits by defendant's agent, known to them as an adjuster of claims representing defendant, and resulted in the payment to plaintiff of the sum of $20, an amount midway between $15 origi-

nally offered by defendant and $25 first claimed by plaintiffs. There were two subscribing witnesses, one defendant's agent and the other an entirely disinterested witness. The latter was not produced at the trial, it being testified on plaintiff's behalf that she was dead, although it appears by affidavit since filed that the witness is still alive. Both husband and wife testified they executed the release without reading it, and in ignorance of its contents. The husband's excuse was that his wife was crying at the time he put his signature thereto, and when he asked the agent "What is on this paper?" the latter "flew up like a wild tiger, just as much as to say 'What do you ask me that for, what do you think I am?'" Then, plaintiff said: "I simply signed it." After this he was asked: "Did you read it before you signed it?" to which he replied: "No, sir, he wouldn't let me," but made no further explanation. There were also allegations by plaintiff that the paper was folded in such a way that he could not observe its contents, and that the agent told him it was a "receipt" for money paid to date, and he would return later, and make other payments, to culminate in a final settlement. The husband was a man of fair English education, a bookkeeper by profession, engaged at a salary of $3,000 a year as an auditor of accounts, and trained to be "accurate and careful."

*Held,* (a) That the evidence, so far as the husband was concerned, was not of the standard required to justify its submission to the jury as sufficient warrant for setting aside the release.

(b) That the testimony relied upon by him to sustain his allegation of fraudulent procurement of the release, plainly showed either a confusion in his mind as to the real facts leading to the execution of the instrument, or such supine negligence as to defeat his claim to either equitable or legal protection.

Mr. Justice SIMPSON concurred in the opinion on the ground of stare decisis, but stated that if the matter were res nova, he would hold that the burden of proof of full knowledge and fair treatment was upon those who relied upon papers obtained under such circumstances.

Argued March 24, 1920.   Appeal, No. 228, Jan. T., 1920, by defendant, from judgment of C. P. No. 2, Phila. Co., March T., 1918, No. 1097, on verdict for plaintiffs, in case of Robert Edmund Ralston and Carrie Ralston, his wife, v. Phila. Rapid Transit Co.   Before BROWN, C. J., MOSCHZISKER, WALLING, SIMPSON and KEPHART, JJ.   Reversed.

260 RALSTON et ux. *v.* PHILA. R. T. CO., Appellant.

Trespass for personal injuries to plaintiff's wife. Before BARRATT, P. J.

Verdict and judgment for Robert Edmund Ralston for $2,000. Defendant appealed.

*Errors assigned* were refusal of (1) instructions for defendant, and (2) judgment for defendant n. o. v.

*Russell Duane,* with him *Horace Stern,* for appellants. —Defendant contends the lower court erred in refusing binding instructions for defendant on the ground that the release executed by both plaintiffs constituted a valid and conclusive defense to their claims: Bruns v. Union Traction Co., 185 Pa. 533; Spritzer v. Penna. R. R., 226 Pa. 166.

This release is valid because executed, in return for a valuable consideration, by two adults in the full possession of their mental faculties: Seeley v. Citizen's Traction Co., 179 Pa. 334; Spritzer v. Penna. R. R., 226 Pa. 166.

The court below should have directed a verdict for defendant on the ground that the evidence in opposition to this release was not clear, precise and indubitable: Kane v. Chester Traction Co., 186 Pa. 145; Penna. R. R. v. Shay, 82 Pa. 198; DeDouglas v. Union Traction Co., 198 Pa. 430; Hicks v. Harbison-Walker Co., 212 Pa. 437; Laird v. Union Traction Co., 208 Pa. 574; Branski v. Wilmsen, 56 Pa. Superior Ct. 153; Ogden v. Phila. & W. C. Traction Co., 202 Pa. 480.

*Herman D. Levinson,* with him *Robert M. Bernstein,* for appellee.—The case was for the jury: Clayton v. Consolidated Traction Co., 204 Pa. 536; Oxweld Acetylene Co. v. Johnson, 72 Pa. Superior Ct. 404; Gordon v. Great A. & P. Tea Co., 243 Pa. 330; Lindemann v. Pittsburgh Rys., 251 Pa. 489; Vanormer v. Osborn Machine Co., 255 Pa. 47; Pittsburgh v. Ihrig, 256 Pa. 410; Hogarth v. Wm. H. Grundy Co., 256 Pa. 451; Ross v. Blair

Limestone Co., 69 Pa. Superior Ct. 128; Isenberg v. Huntingdon M. & L. Co., 62 Pa. Superior Ct. 491.

OPINION BY MR. JUSTICE MOSCHZISKER, May 3, 1920:

Plaintiff, Robert Edmund Ralston, claimed damages, alleged to have been suffered by him through injuries to his wife, due to the negligence of defendant company; he recovered a verdict for $2,000, upon which judgment was entered in his favor; defendant has appealed and asks judgment n. o. v.

A formal release, bearing the admitted signatures of both plaintiff and his wife, was proved; but he contended it was procured by fraud. The issue as to the alleged fraud was submitted to the jury and found against defendant; the question for determination concerns the sufficiency of the evidence to support the verdict.

We shall state the case according to plaintiff's version; but, at the same time, we note that, so far as the procurement of the release is concerned, most of the facts asserted by him are flatly denied by defendant.

Mrs. Ralston was injured, while a passenger upon one of defendant's trolley cars; the following morning, her husband informed the transit company of the accident; a few hours later, one of the defendant's claim agents called at the Ralston residence, and, in the presence of plaintiff, took a written statement from his wife, in which a claim was made against defendant "for the sum of $25," to cover damages suffered by reason of the accident; when upon the stand, plaintiff more than once denied any such claim had been made, asserting he was "positive about that," also saying he was "positive" the subject of a settlement was not even discussed at the time in question, or until the third visit of defendant's agent. He likewise emphatically denied that his wife had signed any statement whatever concerning the accident; but, when shown the writing to which we refer, containing his own signature as a witness, he retracted his former testimony, with the excuse that the matter

had been so long ago he could not remember. At no time, however, did plaintiff allege any irregularity in connection with the procurement of this written statement, which is of importance, for it inaugurated negotiations that culminated in the signing of the release, here attacked; also, it indicates the amount finally paid closely approximates that originally claimed.

To set aside the release, plaintiff presented merely the testimony of himself and wife; and that given by the latter differs in several material respects from plaintiff's own version—both as to the preliminary negotiations leading up to final settlement and what actually occurred at the execution of the release. It is not necessary to state in detail these differences, for the fact that they exist is the material circumstance to which we wish to call attention.

It appears plaintiff knew that the man, who procured the release, was a representative of defendant company, and that he called for the very purpose of negotiating a settlement. Subsequent testimony shows several other visits by defendant's agent, culminating in the payment seven days after the accident of $20—an amount midway between $15, originally offered by defendant, and $25, first claimed by plaintiff.

The release was executed by both Ralston and his wife, in the presence of defendant's agent, and another, entirely disinterested, subscribing witness. The latter was not produced at trial, it being testified on plaintiff's behalf that she was dead; although it appears, by an affidavit since filed, that such testimony is either false or mistaken, for the witness is still alive. This matter is discussed at length in our opinion disposing of the appeal in the case of Carrie Ralston, and need not be further referred to here.

Ralston and his wife both testified they executed the release without reading it, and in ignorance of its contents. So far as plaintiff is concerned, his only excuse for not reading or otherwise informing himself as to

the contents of the paper, is that his wife was crying at the time he put his signature thereto, and, when he asked defendant's agent, "What is on this paper?" the latter "flew up like a wild tiger, just as much as to say 'What do you ask me that for, what do you think I am?'" Then, plaintiff said, "I simply signed it." After this, he was asked, "Did you read it before you signed it?" to which he replied "No, sir, he wouldn't let me." Plaintiff does not attempt to say what means, if any, were taken to prevent him from reading or informing himself as to the contents of the paper; so his mere assertion, that the agent "wouldn't let" him read it, can only be referred to the prior vague statement to the effect that, when he (plaintiff) asked about the contents of the paper, the agent flew up "like a wild tiger."

The testimony which we have already recited—together with allegations that the paper was folded in such a way plaintiff could not observe its contents, that the agent told him it was a "receipt" for money paid to date, and he would return later and make other payments, to culminate in a final settlement—constitutes the evidence relied upon to set aside a somewhat lengthy, formally drawn, sealed release of damages, admittedly signed by a thoroughly literate and mentally capable man of affairs, after negotiations with one whom he knew to be an adjuster of claims representing the defendant company.

Each of the following cases, in one respect or another, is relevant to the one in hand; and, when considered together, as a line of authorities, the principles here applicable will appear therefrom.

Pa. R. R. Co. v. Shay, 82 Pa. 198: Plaintiff, who signed a release, said he could neither read nor write; but execution of the paper was not denied. He did not know contents of instrument, understood it to be simply a receipt for expenses, and did not intend to release damages when he put his name thereto. While the representative of defendant told plaintiff it was a receipt

(as it was), it also was a release, which he did not tell plaintiff. The case was submitted to the jury, to find whether the release had been "obtained by fraud." We said there was no evidence to justify submission, and, applying the rule laid down by Justice GIBSON in Greenfield's Est., 14 Pa. 489, 496—"If a party who can read will not read a deed put before him for execution......
he is guilty of supine negligence, which......is not the subject of protection either in equity or law"—we reversed a judgment for plaintiff. This authority is followed in many later cases, and is cited as late as O'Reilly v. Reading Trust Co., 262 Pa. 337, 343.

Seeley v. Citizen's Traction Co., 179 Pa. 334: Plaintiff, a woman, released damages, for $25, six days after the accident; she testified that she did not "comprehend the nature of the writing." The trial court instructed for defendant, and we affirmed a judgment in its favor. No evidence of "trickery or fraud" appears; but the case is important here because we there recognize (p. 338), as a relevant consideration in passing upon the validity of the release, the fact that plaintiff was a person of "intelligence and fair education"—as is the present plaintiff.

Bruns v. Union Traction Co., 185 Pa. 533: Plaintiff's husband was hurt at his work, August 9th, and died, as the result thereof, August 15th; the day before his death, he executed a release, upon payment of $40. The evidence tended to show the paper was signed when deceased was "mentally competent," and after he had "bargained" with the representative of defendant company; the fact of this prior bargaining was taken into consideration in affirming judgment on a directed verdict for defendant, as it must be in the case now before us.

Kane v. Chester Traction Co., 186 Pa. 145: Plaintiff, a woman, signed a release; she claimed it was obtained through fraudulent representations by defendant's agent, who told her the local judge was a stockholder in defendant company, and, therefore, she had no chance

to win a suit at law. We said, assuming as a fact that such false statement was made, there was no "clear testimony" that it induced the execution of the release; and stated (p. 150) the "flimsy nature" of the alleged misrepresentations was such as not to affect the judgment of a person of "common sense." We also said "the fact that the injuries proved greater than they looked to be at the time of the release is not to be considered at all," citing Seeley v. Citizens Traction Co., 179 Pa. 334. Judgment for defendant was affirmed. Here again the apparent "common sense," or intellectual capacity, of the person who signed the release is taken into account in passing upon the evidence as to its validity.

In DeDouglas v. Union Traction Co., 198 Pa. 430, binding instructions were given for defendant, and judgment in its favor affirmed. Plaintiff, a woman, signed a release, a few days after the accident, on payment of $50. She testified that an agent of defendant company called on her, paid the money, and asked for a receipt; whereupon she put her name to a paper which he produced. We held the proofs insufficient to overcome the release, saying: When evidence to set aside a release is not "clear, precise and indubitable," the issue "should be withdrawn from the jury." This is an authority that, in such cases, it is the right and duty of the court to judge as to the sufficiency, in quality, of evidence to go to the jury, on a question of alleged fraud in the procurement of a release.

Ogden v. Phila. & West Chester Traction Co., 202 Pa. 480: Plaintiff signed a release, and afterward set up an oral agreement, made at same time (by way of inducement), which entitled him to compensation beyond that given under the release. A judgment on the verdict for plaintiff was reversed. We held (p. 485) that the evidence was not "clear, precise and indubitable," and the trial judge, "as chancellor," should have so declared (p. 486); that the evidence was not sufficient to "warrant the destruction of a written instrument"; and, ap-

plying the rule in Pa. R. R. Co. v. Shay, 82 Pa. 198, in that regard, stated (p. 487) : "Where a chancellor could not reform a written instrument......because of the doubtfulness of the parol evidence to set it aside...... he should not permit twelve chancellors in a jury box to nullify it."

Laird v. Union Traction Co., 208 Pa. 574: Plaintiff executed a release, on payment to him of $150, the day after the accident; a judgment for defendant, following binding instructions in its favor, was affirmed. Plaintiff claimed he was unconscious from his injuries, when the release was signed. We said, "To set aside a written instrument, the evidence must be clear, precise and indubitable, whether the allegation be fraud practiced by the beneficiary under it [i. e. the person to whom the release is given] or incapacity by him who executed it"; and added, there was no evidence of fraudulent representation or undue persuasion when the release was executed, but there was "some slight evidence on part of plaintiff that he was in a state of unconsciousness" at that time. The case is treated as though there were no evidence of fraud present; and this apparently because of the insufficiency of the testimony as to plaintiff's unconsciousness; for, if plaintiff were really in a state of unconsciousness, when the release was taken from him, and defendant knew it, the obtaining of the paper under such circumstances would, in itself, be a fraud. This authority is valuable here, for it clearly rules that the trial judge, in such cases, acts as a chancellor in passing on the legal sufficiency of the proofs (pp. 576-7)—as to whether or not they measure up to the standard required—and, if he considers the evidence not of a quality to be reasonably found "indubitable," he should not submit it to the jury.

Hicks v. Harbison-Walker Co., 212 Pa. 437: Plaintiff, who signed a release, on payment of $25, claimed the person who obtained his signature thereto "misrepresented it as a receipt for money donated to him"; he

could not read, and did not ask to have the paper read. We considered plaintiff's "mental capacity"; and, noting that his story was uncorroborated, applied the rule from Greenfield's Estate, 14 Pa. 489. Judgment on binding instructions for defendant was affirmed.

Spritzer v. Pa. R. R. Co., 226 Pa. 166: Damages were released, for $200. Plaintiff claimed he "was not in mental condition to appreciate what he was doing" at the time the release was signed. Judgment on a verdict for plaintiff was reversed. This court said (p. 168): "Starting with the presumption in favor of the release, the burden was on plaintiff to show conditions which would avoid it in law." We then note that, "when the attempt is not to alter but to overthrow a release," one witness is sufficient; adding, however, that, plaintiff having failed to prove he did not know what he was doing, the release must prevail. In the course of our consideration of the law, we state (p. 173): "Nothing short of evidence precise, clear and indubitable can be allowed to overcome a written instrument; when it does not come up to this measure, the case should be withdrawn from the jury."

Baranski v. Wilmsen, 56 Pa. Superior Ct. 153 (RICE, P. J.): Plaintiff signed a release written in English; judgment in his favor was reversed, because there was no sufficient evidence to justify the "special finding" of the jury that defendant procured plaintiff to sign by "fraud" (p. 158). Baranski was a foreigner, who could neither read nor write English, but the negotiations, leading to the release, were carried on in a language he understood. The paper was executed three weeks after the accident, when the injured man was mentally capable. Plaintiff did not ask to have the paper read to him; although he requested an interpreter be provided, which was declined (p. 160). While Baranski was not told the document was not a release, neither was he informed it was of that character. The Superior Court applied the rule laid down in Pa. R. R.

Co. v. Shay, 82 Pa. 198, saying (p. 161) : "If one who can, will not read a paper put before him for execution, he is guilty of supine negligence," which "is not the subject of protection either in equity or at law," adding, "nothing short of evidence precise, clear and indubitable can be allowed to overcome a written instrument," and, when the proofs do not measure up to this standard, "the case should be withdrawn from the jury."

While all said in the case last cited is not adopted, it is important for the definition we are about to give, and its application by Judge RICE. "When the terms clear, precise and indubitable, are used, in defining the requisite proof of a particular fact to be made out by oral testimony, it is meant that it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify, that they narrate the details exactly, and that their statements are true." After this definition (which is approved by us in Lindemann v. Pittsburgh Rys. Co., 251 Pa. 489, 492, 494, infra), President Judge RICE states that, since plaintiff gave several discrepant versions, concerning the circumstances relating to the execution of the paper in controversy, doubt was cast upon the "distinctness of his recollection and the exactness of his statements"; therefore his evidence could not be considered "clear, precise and indubitable." For instant application of the rule under discussion, see next to final paragraph of this opinion.

The line of cases just reviewed furnishes ample authority for holding, as we do, that, under the evidence at bar, plaintiff's claim should have been withdrawn from the jury by binding instructions for defendant.

Where a writing is executed by reason of misrepresentations as to its contents, the instrument is not the deed of the party who signed it (Green v. North Buffalo Township, 56 Pa. 110, 114) ; but, in order to set aside a solemn written instrument on this principle, the facts alleged for that purpose must be "definitely and distinctly established": Burt v. Burt, 221 Pa. 171, 174. Of

course, whether the evidence is true is a question of fact
(Pusic v. Salak, 261 Pa. 512, 519), but whether it meets
the required standard which justifies its submission to
the jury (to pass upon its truth) is always a question of
law; and, as we have seen from numerous authorities
here cited, some of the qualities required of evidence, to
set aside a written instrument on the ground of fraud in
its procurement, are that the witnesses depended upon
for that purpose shall "distinctly remember the facts to
which they testify" and "narrate the details exactly":
Lindemann v. Pittsburgh Rys. Co., 251 Pa. 489; Ba-
ranski v. Wilmsen, 56 Pa. Superior Ct. 153, supra.

Here, the transcript of plaintiff's evidence shows that
he either deliberately falsified certain material facts or
(in the words of Judge RICE in the case last cited) that
he cast serious doubts upon "the distinctness of his recol-
lection and the exactness of his statements." Under
these circumstances, the evidence was not of the stand-
ard required to justify its submission to the jury as suf-
ficient warrant for setting aside a solemn written instru-
ment. As said by Mr. Justice GREEN, in Wojcie-
chowski v. Spreckels' S. R. Co., 177 Pa. 57, 65, "No
man's deed for the house he lives in would be safe if it
could be destroyed by such testimony as this"; and we
may add that all future efforts to compromise damage
claims might well be abandoned if formal releases can
thus easily be set aside.

To say the least, the testimony relied upon by plain-
tiff, to sustain his allegation of fraudulent procure-
ment of the release, plainly shows either a confusion in
his mind as to the real facts leading to the execution of
the instrument or, if not that, then it discloses the case
of a man, mentally capable and with business experi-
ence, dealing with another, whose character—as the
representative of one against whom he had a claim—was
fully known to him, and with whom for several days he
had been in negotiation for settlement, signing a release
(which he had an opportunity to read, had he seen fit

to take advantage of it), upon payment of an amount midway between the sum originally claimed by him and that originally offered by defendant. Looking at the matter from the first aspect, the evidence was not up to the standard required by law to accomplish the end in view, and, from the other, it presents a case of what Mr. Justice SHARSWOOD, in Pa. R. R. Co. v. Shay, 82 Pa. 198, 203 (quoting Chief Justice GIBSON), designates as "supine negligence"; which, he correctly adds, is "not the subject of protection, either in equity or at law."

The following cases, relied upon by plaintiff, where releases have been set aside, are all distinguishable from the one at bar; but, as will be observed, even some of these fully recognize the principles which we have applied in determining that defendant is entitled to judgment in its favor.

Ettinger v. Jones, 139 Pa. 218, is one of those cases which must be confined to its own peculiar facts. A woman, whom defendant had got into trouble and promised to marry, signed a release, at his urgent solicitation, when she was under great mental stress; the only consideration was that imparted by the seal upon the instrument, and a renewal of the promise to marry when defendant got out of trouble with another woman. In affirming judgment for plaintiff, we held the release, obtained by "trick and fraud," was void.

Gibson v. W. N. Y. & Pa. R. R. Co., 164 Pa. 142, is a case where plaintiff proved that, when his name was put upon the release, he was mentally incapable, from the effects of anæsthetics administered a short time before. Apparently, it was not alleged defendant either knew of or took advantage of plaintiff's weakened mental state, the sole contention being that, owing to his lack of mind, no contract existed. In deciding this issue was for the jury, we said (p. 149) : "Where a fraud......in the creation of the instrument, is the defense, it is a purely equitable one and equitable rules will be enforced as to the measure of proof to sustain it, but where the defense

rests on the existence of a fact involving no element of. fraud, the evidence is for the jury, under the common law rules of evidence."

Julius v. P., A. & M. Traction Co., 184 Pa. 19, is much like the case just reviewed.

Clayton v. Consolidated Traction Co., 204 Pa. 536: Plaintiff, a woman, signed a release, upon payment of $5, ten days after the accident; she afterwards claimed it was procured by fraud. Judgment on a verdict against defendant was affirmed. Plaintiff testified a man called at her house, claiming he was a friend of the car conductor who had caused the accident, and said he had come to see her in regard to getting the former reinstated in his position. At a second interview, this man inquired how much expense she had been put to, and, when told $5, gave her the amount, asking for a receipt. He produced a paper, folded in such way plaintiff could not read it; neither did he read it to her, but designated the place where he desired her to sign. Plaintiff did not know the man was a representative of the company. This testimony was fully corroborated by a disinterested witness. We said (p. 541) that defendant's agent not only misrepresented the true character of the release, but "prevented" its contents from being known, and this, taken with the other circumstances in the case, constituted such fraud as to avoid the instrument. However, we there expressly recognize the authority of Pa. R. R. Co. v. Shay, 82 Pa. 198; and DeDouglas v. Union Traction Co., 198 Pa. 430, but distinguish them on their facts; we also recognize the authority of Greenfield's Estate, 14 Pa. 489, and, in this connection, state that the mere circumstance of the release not being read to plaintiff would not convict defendant of fraud in procuring it; finally, we direct attention to the fact that the man who called upon plaintiff did not introduce himself as a representative of defendant or, in any sense, negotiate for a settlement of her claim against the traction company. These facts,

with other apparent differences, distinguish the case from the one now on appeal.

In McCaw v. Union Traction Co., 205 Pa. 271, while a release was set aside, on ground of fraud in its procurement, the report fails to show the character of the evidence, except that plaintiff claimed he was unconscious when the paper was alleged to have been executed by him. The only assignment concerns critical comments by the trial judge on the release. The case is not enlightening.

Gordon v. Great A. & P. Tea Co., 243 Pa. 330: Plaintiff signed a release, which he claimed was procured by fraud. Judgment, entered on a verdict for plaintiff, was affirmed. A payment of $150 had been made at the time the release was signed; but plaintiff presented evidence to show he was then in an enfeebled mental condition, as the result of a "head operation," necessitated by the accident; that the representative of defendant informed him the $150 was a gratuity from his employers, "to put" him over the holidays, and the word "release" was not mentioned; that a document was placed before him with only the signature line exposed; and he was hurried in the execution of the paper, which the representative of the company stated was merely a receipt. We said (p. 335) the evidence was sufficient to justify the plea that plaintiff's mind "was so enfeebled at the time he signed the paper he could readily have been made a dupe of designing persons," and this, together with the other evidence in the case, was ample to sustain a finding that he was deceived and defrauded into the execution of the alleged release, adding, "the fact that plaintiff did not read or require the paper to be read to him" could not (under the peculiar circumstances) be given binding effect, for he had not been afforded a "fair opportunity for examination" thereof, and had been deceived as to its contents. We there note the distinction between cases where the effort is to "reform" and those in which the attempt is to "set aside" written instruments; also, in the latter class of cases,

the difference between those where either the "element of fraud or mental enfeeblement" appears, and instances where such elements are lacking. Here, in the pending case, the effort is to set aside the release, and, while fraud in its procurement is alleged, the evidence depended upon to prove that element fell short of the legal standard required for the purpose, as already shown in our review thereof, and as we shall hereinafter briefly discuss. The facts at bar and those in the last cited case differ in many apparent respects.

Lindemann v. Pittsburgh Rys. Co., 251 Pa. 489: Plaintiff signed a release, upon payment to him of $50. At trial, there was ample evidence,—both lay and expert,— to sustain plaintiff's contention that the release had been executed when he was mentally incapable; and the issue was decided accordingly. All that is said in the opinion of the court below, affirming judgment on the verdict (adopted per curiam) must be read with the peculiar facts of the case in mind. This definition, relevant here, is there approved: "Indubitable proof is evidence that is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt."

In Hogarth v. Grundy, 256 Pa. 451, it was alleged plaintiff signed a release, on payment of $200. Plaintiff admitted some money was given him by his employers; but said it was at a time when he was suffering intensely from the effects of an amputated arm. The agent of defendant, who called to get the release, did not make known to plaintiff who he was, and the latter did not know him; he told the injured man that he was going to give him a "little money," as a "present" from his employers, "to help him out on expenses." Plaintiff had no recollection of signing the release,—which contained only his mark—or any other paper, and he denied that the man, who brought the money, said anything about a settlement of his claim against defendant. He was corroborated by his wife. We affirmed judgment for plain-

tiff; but, as may be seen, the case is readily distinguishable from the one before us.

Vanormer v. Osborn Machine Co., 255 Pa. 47: Plaintiff signed a release in consideration of $1,150, and subsequently claimed it was obtained by fraud. He testified the agent of the company, which insured defendant, got his signature by pretending to have a telephone conversation with his, plaintiff's, doctor, an eminent eye-specialist, "in which the agent quoted the doctor," who had just examined plaintiff, as saying the latter's right eye, "would come out all right, and he would soon be able to resume his work." The injured man, relying on the information thus conveyed to him, as to his physical prospects for the future, signed the release; whereas the pretended conversation was an absolute falsehood, and plaintiff soon afterwards lost the sight of his eye. We sustained a judgment entered on a verdict against defendant; for the evidence was ample in every way to show a direct case of fraud in the procurement of the release.

We have reviewed the cases cited to us by counsel on both sides, and believe they comprehend all recent rulings on the subject in hand; we shall now refer to the latest relevant authority. In Palkovitz v. American Sheet & Tin Plate Co., 266 Pa. 176, 181, plaintiff, an ignorant foreigner, who did not understand our language, signed a release, typed in English. On appeal, affirming judgment in his favor, we said that, since defendant's own, principal, witness had proved the alleged release to have been procured under such circumstances as to destroy entirely its effectiveness, it was "not in a position successfully to maintain plaintiff had failed to produce sufficient evidence to that end." While the statement just quoted is sufficient to distinguish the case from the one now before us, yet another distinguishing point between the two is the illiteracy of Palkovitz, as compared with the plaintiff at bar, who is a man of fair English education, a bookkeeper by profession, en-

gaged, at a salary of $3,000 a year, as an auditor of accounts, which work had trained him to be "accurate and careful," as he admitted on the stand.

Of course, every slight departure or variation in testimony, depended upon to set aside a written instrument on the ground of fraud, will not condemn the proofs as insufficient; but, in the present instance, as already pointed out, the evidence clearly fails to measure up to the required legal standard, which, as hereinbefore shown, is that in such cases the proofs must be clear, precise and indubitable. The first mentioned requirements mean that the witnesses must be credible, distinctly remember the facts to which they testify and narrate the details exactly (Lindemann v. Pittsburgh Rys. Co., supra); and, to the extent we are at present concerned with the last requirement—that the statement of the witnesses must be indubitable, or true (that is, so far as we are concerned with its application to the preliminary consideration of the evidence by the court, to judge of its sufficiency to go to the jury)—it simply means that, disregarding counter-attacks on plaintiff's proofs, they must have the appearance of truth, at least to the extent of being free from manifest inconsistencies, or marks of inherent unreliability. Unfortunately for plaintiff, this cannot be said of the testimony upon which he depends, and the court below erred in law when it refused so to hold.

The assignments of error are sustained, the judgment in favor of plaintiff, Robert Edmund Ralston, is reversed, and, so far as his claim is concerned, judgment is here entered for defendant.

CONCURRING OPINION BY MR. JUSTICE SIMPSON:

If I correctly apprehend the opinion of the majority, its analysis of our prior cases results in the establishment of the following principles as applicable herein and hereafter: Where a plaintiff asks a jury to disregard a release executed by him, and the essential facts in

relation thereto are disputed by defendant's evidence, it is incumbent upon plaintiff to prove the facts relied upon beyond a reasonable doubt, by evidence which is clear, precise and indubitable, and is given by witnesses who are credible, who distinctly remember the facts to which they testify and narrate the details exactly, the question whether the proof, in its most favorable aspect for plaintiff, meets the required standard being always a matter of law for the court, and only when it does so is its truthfulness to be submitted to the jury; that this rule applies alike in cases of alleged fraud in procuring the release or in taking advantage of plaintiff's alleged incapacity at the time he executed it, and is particularly applicable if he is a mentally capable man of affairs; that it is supine negligence not to read the paper before signing it, and hence one who can read it or has an opportunity to get others to do so for him, cannot be heard to say he was not permitted to or did not or could not read it, or that he did not understand or was mentally incapable of understanding its contents (except where, in the latter instance, he gives facts showing an impaired mentality), unless by false representations, trick or fraud, calculated to deceive a man of his intelligence, and definitely and distinctly established, he was hurriedly misled into signing it without reading; and this is especially so where he knew he was dealing with a representative of defendant, who was trying to negotiate a settlement, and the sum paid was approximately that which plaintiff demanded, or was reached as a result of bargaining.

While expressions can be found in our prior decisions, which, if dissevered from their context or because of undue emphasis being placed thereupon, would seem to point to an opposite conclusion from that reached in the careful analytical opinion of the majority, yet taken as a whole those prior opinions compel the conclusion stated above; and as they were reached in cases in all essential respects similar to the present, stare decisis requires me

to concur in the judgment now entered. I regret this partially because those prior opinions ignore scientific knowledge regarding the mental condition of those suffering from shock, and partly because the conclusion reached does not seem to me to be in accord with the present trend of public sentiment on these subjects. In view thereof it is but proper I should state herein my reasons for so thinking.

When a man is injured in an accident, particularly if it be by a carrier, there is not infrequently a race to his bedside, the contestants being the ubiquitous and intrusive claim adjuster of the defendant and the equally ubiquitous and intrusive runner of the ambulance chaser. In many such cases the injured party is led to believe he is or will be without means to pay expensive doctors' bills or prosecute still more expensive litigation; and neither he nor the members of his immediate family then know the extent of the injury, or are in a mental condition to enable them accurately to weigh the suggestions made or to appreciate the selfishness of the intruder, and hence are easily misled into signing papers which are their undoing. Releases thus obtained are generally for grossly inadequate sums, and agreements to have the ambulance chaser prosecute a suit to recover damages for the injury, are usually so drawn as to irrevocably give him inordinate contingent fees, and to leave the parties who sign them liable to other litigation if they settle with the defendant. The claim adjuster minimizes the injury, and out of a boundless ignorance does not hesitate to assert positively that under no circumstances can damages be recovered, and the runner out of a like ignorance with equal positiveness asserts that a recovery is certain if his ambulance chaser is employed; each specifies cases wherein his judgment has been proved sound, and at times neither hesitates to so state his case as to convey the impression that no small measure of his success grows out of his influence with the courts. By flattery, persuasion and well expressed though

often imaginary sympathy, one or the other obtains the confidence of the injured party, though ostensibly dealing with him at arm's length, and through the confidence thus acquired gets the paper signed. For the reasons thus briefly outlined, which do not relate to this case but to the subject generally, I would, were the matter res nova, unhesitatingly hold that the burden of proof of full knowledge and fair treatment was upon those who rely upon papers obtained under such circumstances; as it is not, the remedy, if one is to be applied, must be obtained by legislation.