## Horsey v. Ciaroro.

*Negligence—Personal injuries—Release—Impeachment for fraud.*

1. Where, in a negligence case, defendant sets up a release of damages executed by the plaintiff, and the latter seeks to have the jury disregard it, and the essential facts with regard to the execution are in dispute, the burden is on the plaintiff to prove the facts upon which he relies, beyond a reasonable doubt, by evidence which is clear, precise and indubitable, and by witnesses who are credible, who distinctly remember the facts to which they testify and narrate them exactly.

2. If a party who can read will not read a release put before him for execution, or, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which will bar him from relief.

Motions for new trial and judgment *n. o. v.* C. P. No. 5, Phila. Co., Dec. T., 1920, No. 876.

*H. A. Mackey* and *A. T. Ashton,* for plaintiff; *W. F. Whittle,* for defendant.

MONAGHAN, J., Aug. 23, 1923.—The plaintiff, Charlotte Horsey, brought suit against the defendant, Angelo Ciaroro, alleging that on Nov. 9, 1920, while walking on the pavement at the southeast corner of Seventeenth and Fitzwater Streets, she was injured by an automobile negligently driven by the defendant. The jury rendered a verdict in her favor for $4750; the defendant filed motions for a new trial and for judgment *non obstante veredicto.*

The motion for judgment *non obstante veredicto* raises the controlling question, and that concerns the sufficiency of the evidence relied upon by the plaintiff to set aside a written release of damages, which the plaintiff contends was procured from her by fraud.

We state the case according to the plaintiff's version. Immediately after the accident, Nov. 9, 1920, the plaintiff was taken to the Polyclinic Hospital, where she remained until Dec. 22, 1920, a period of about six weeks, when she returned to her home. Her injuries consisted of a simple fracture of the left fibula, an injury to the right shoulder which resulted in synovitis, multiple contusions of the body, etc. While in the hospital her relatives caused this suit to be instituted. Jones, an adjuster of claims for the Maryland Casualty Company (the policy of which apparently protected the defendant from loss in this suit), visited the plaintiff thereafter, in the hospital, on three occasions. He told her he represented the insurer of the defendant, and, after negotiations, offered to compromise her claim for $500. At first, she referred Jones to her lawyer, Mr. Ashton; eventually, she referred him to her nephew, and refused to make settlement for the sum offered. Her suit was on the list for trial in this court on Jan. 5, 1921; two days before, Jan. 3, 1921, Jeter and Nutter, who represented the Pennsylvania Adjustment and Detective Agency, an independent adjustment concern, called upon the plaintiff at her home. She had never met them prior to that time. They represented to her that they had sent to Harrisburg and had succeeded in getting $1500 for her as "charity money," and all she had to do was to go and collect it; they did not tell her the particular place or office from which she could collect, and she did not inquire in that regard. They informed her that she had a clear case and could get "maybe $500 to $1000." Her pastor, Reverend Tindley, called on her about this time and inquired of the men "how much she could get," and they replied, "$1500." The men were urging her to go with them to collect the money, and she made tentative arrangements to go with them. The men and the pastor left the house; the pastor returned, the men not being present, and advised the plaintiff to "let it alone and not bother with it." The pastor left the house and Jeter and Nutter returned. She apparently declined to go with them, and informed them of what the pastor had said; the men then

left the house; on their return, they told her they had talked with her pastor and that he had said it was all right and to "go ahead." She was not satisfied with the message; the men then left the house, and, on their return, told her they had again spoken to the pastor, who advised that she go with them and they would represent him. The pastor, when called as a witness for the plaintiff, admitted the men did see him, but testified that he did not authorize them to represent him in any way to Mrs. Horsey; and that, on the contrary, he told them that Mrs. Horsey had agreed not to go after the money. Relying on the representations made by Jeter and Nutter, the plaintiff, accompanied by her church friend, Caroline Palmer, and the two men, then proceeded by automobile to an office at Third and Walnut Streets. While the men probably had created confusion in her mind as to the character of the place to which they intended to take her, when she arrived at the destination, she knew she was in the office of the Maryland Casualty Company; and there she met Jones, whom she recognized as the same person who told her, when she was in the hospital, that he was a representative of the defendant's insurer and had offered to compromise her suit for $500.

Jeter opened the proceedings in the office of the casualty company by asking for a million dollars; a representative of the company, to whom he made this proposal, declined it; after considerable bargaining, in which various sums under $1000 were mentioned, Jeter informed the plaintiff that the gentleman to whom he was talking was willing to give $500. The plaintiff asked if that was "all they could do." Then there was a call on the telephone; Jeter talked to the person at the other end, and told the plaintiff the call was from the home office in Baltimore. The plaintiff then went to the telephone and talked to a man (whom she afterwards found to be Acker, President of the Pennsylvania Adjustment and Detective Agency), who told her he "could not give but five hundred," and if she "didn't get that," she "wouldn't get anything," and to "take the five hundred." A paper was then brought to the plaintiff to sign; she signed something; the release in question was produced for inspection at the trial, and she said the signature to it "looks like her writing." She did not read the paper she signed, because she "could not read very good," and even though she read it, she "could not understand it, anyhow." She testified that Caroline Palmer, who was with her, might have read the paper to her, but she "does not remember that she did;" and she "does not remember whether the paper was read or explained to her;" she supposed she was signing something for $500, but did not know what she was signing, and did not know that she was effecting a settlement of her suit. After the paper was signed, Jones delivered a draft to her, dated Jan. 3, 1920, payable to her order, for the sum of $500. She admitted that she endorsed the draft, which on its face purports to be "In full settlement and satisfaction of all claims resulting from accident happening on or about Nov. 9, 1920." Above her endorsement on the draft is the recital: "The endorsement hereof by the payee constitutes a receipt and release for the item mentioned in this draft." She thereafter handed the draft to Jeter to have cashed, and he, in turn, delivered it to Acker, who called at the plaintiff's home the next morning and paid her $350, he retaining $150. On the evening of Jan. 4, 1921, Mr. Frey, of counsel for the plaintiff, called upon her and informed her that her case would not be tried on Jan. 5th, and not to come to court until Jan. 6th, as the case would not be reached until that date. On the evening of Jan. 5, 1921, Jeter and Nutter called upon her and requested her to say that she was satisfied with the settlement; she refused to do so, and on Jan. 6th the plaintiff attended court with her counsel. The case was not tried, however, until May 5, 1921.

3 D. & C.

The plaintiff has never offered to return the $500, or any part of it, to the defendant or the casualty company.

In considering the circumstances attending and surrounding the alleged settlement, we give credence to the plaintiff's version. Her testimony, in its material phases, so far as the procuring of the release is concerned, is contradicted by the actors concerned in it.

The record is barren of any evidence which would warrant a jury in arriving at a conclusion that the defendant, or the Maryland Casualty Company, or its representatives, had any knowledge of any false representations made to the plaintiff by Jeter and Nutter; nor was there any testimony presented competent to establish that those men were acting on behalf of, in combination with, or by procurement of, the defendant or the casualty company. There is no proof that the defendant, or the casualty company, or its agents, during the period of the entire transaction now reviewed, were in any manner responsible for, knew, or had the means of knowing, of any trick, artifice, misrepresentation or fraud employed for the purpose of luring the plaintiff to the office of the company, or that the plaintiff was laboring under the belief that she was to receive "charity money" and not a settlement of her suit. The testimony does not show that, while this plaintiff was in the office of the casualty company, any act was done, or any word was spoken, by any person which could give rise to a suggestion or intimation that the plaintiff had been brought there by undue means, or that she thought she was receiving or was about to receive "charity." The plaintiff herself had elected to act under and follow the directions of Jeter and Nutter; any improper motives of the latter, or the thoughts, beliefs or expectations of the former, not disclosed to the company or its agents, cannot be ascribed or imputed to them. The situation, so far as the company and its representatives were concerned, during the whole period covering the transaction discussed, was that they were dealing at arm's length with the plaintiff and Jeter, Nutter and Acker.

The evidence presented in behalf of the plaintiff does not show that any person hindered or prevented her from reading the paper in question, presented to her for signature by the company; nor does it show that any person misrepresented to her its contents, nature or effect. She was a widow, colored, sixty-five years of age. It is not proven or even suggested that she was lacking in mental capacity. The time of the execution of the release was two months after the accident, and she had been out of the hospital for twelve days. While she had not fully recovered from her injuries, and was using a cane to assist her in walking, there was no testimony offered to show that her injuries were such as to interfere with her mental faculties. She was of fair intelligence and could read. She said that while in the hospital she read a "good bit," but that she could not read "very good," and could not understand all she did read. But nothing was done or said to prevent her either from reading the paper presented to her for signature or from asking some person to read and explain it to her. She said that Caroline Palmer, who was with her, "might have read it to her," but she "did not remember that she did," and she "does not remember whether the paper was read or explained to her;" and she said, further, that the signature to the release "looks like her writing." She does not, however, deny that she signed the release, or that it was read or fully explained to her. For aught that appears in her case, the release was read and explained to her, and she signed it. In the absence of proof to the contrary, we must so determine, for the burden is on her to establish the facts upon which she relies, by clear and precise proof, beyond a reasonable doubt. "Where, in a negligence case, defendant sets up a release

of damages executed by the plaintiff, and the latter seeks to have the jury disregard it, and the essential facts with regard to the execution are in dispute, the burden is on the plaintiff to prove the facts upon which he relies, beyond a reasonable doubt, by evidence which is clear, precise and indubitable, and by witnesses who are credible, who distinctly remember the facts to which they testify and narrate the facts exactly:" Ralston v. Ralston, 267 Pa. 257; Leonard v Coleman, 273 Pa. 62, 67; and see Laird v. Union Traction Co., 208 Pa. 574, 577.

While in this opinion we have adhered to the plaintiff's version of the facts, abundant evidence was produced by the defence showing that plaintiff signed the release with full knowledge of its contents, nature and effect, and that she received the money, not as "charity," but in settlement of her suit. See Hicks v. Harbison-Walker Co., 212 Pa. 437.

Applying the principles stated, we cannot assume, or find, from the circumstances attending the procurement of the release—whether we consider the plaintiff's version or the defendant's version— other than that the release was read and fully explained to the plaintiff. She must be held to have known its contents, nature and effect when she signed it; therefore, any antecedent misrepresentations or fraud of Jeter and Nutter could not have been the inducing cause of her execution of it. There is thus removed from the case the only fraud or misrepresentation alleged by the plaintiff, and her release must be declared valid.

Even if the plaintiff did not read the release, or call upon some person to read it for her, before signing, when there was no obstacle thrown in her way to do so, and no misrepresentation made as to its contents, then she was guilty of supine negligence, which would bar her from relief. "If a party who can read will not read a deed put before him for execution, or if, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which . . . is not the subject of protection, either in equity or at law:" Greenfield's Estate, 14 Pa. 489; Pennsylvania R. R. Co. v. Shay, 82 Pa. 198; Hicks v. Harbison-Walker Co., 212 Pa. 437; Ralston v. Ralston, 267 Pa. 257; Leonard v. Coleman, 273 Pa. 62.

The plaintiff having failed to produce the clear, precise and indubitable proof warranting the setting aside of the release, the question of the validity of the document should not have been submitted to the jury; binding instructions should have been given for the defendant.

The motion of the defendant for judgment *non obstante veredicto* is now granted; therefore, the motion for a new trial is discharged.