**HOSEA et al. v. DROHN et al.**

**Civ. A. No. 7251.**

United States District Court
W. D. Pennsylvania.

Nov. 29, 1951.

Wallace M. Parker (of Bechman, Dunn, Parker & McGregor), Pittsburgh, Pa., Edward O. Golden (of Kountz, Fry, Staley & Meyer), Pittsburgh, Pa., for plaintiffs.

A. R. Chase, Clearfield, Pa., Albert A. Geary, Clarion, Pa., John E. Evans (of Evans, Ivory & Evans), Pittsburgh, Pa., for defendants.

MARSH, District Judge.

In this case, plaintiffs, Max E. Hosea and Charles A. Lampel, allege that they purchased certain stock for $80,000.00 from the defendant, H. H. Drohn, and that he, by certain fraudulent statements upon which the plaintiffs relied, induced them to pay to him $15,000.00 in cash as an additional down payment on the price, for which payment Drohn has refused to give credit. This action, in the nature of a bill in equity, is brought to compel Drohn and the defendant Bank, as trustee holder of the stock and collector of deferred payments, to give this credit or repay the $15,-000.00 with interest. The court is of the opinion that plaintiffs cannot prevail.

The plaintiffs are citizens of the State of Indiana and the defendant Drohn is a citizen of Pennsylvania. The defendant Bank is a Pennsylvania corporation.

In July, 1946, Drohn owned 582 shares of the capital stock of the Community Telephone Company, of New Bethlehem, Pa., a Pennsylvania corporation. The total outstanding stock of this Company was 1,000 shares; each share had a par value of $25.00, and a book value of $58.50. The book value is computed from a statement as of June 30, 1946, sent to Lampel by Drohn, which also disclosed a surplus of $33,546.00 and cash in banks of $25,439.19. The board of directors consisted of seven members. Drohn was a director until his resignation on or about August 13, 1946.

In 1946, Lampel advertised his desire to purchase a telephone business. Drohn indicated his interest and these parties met in New Bethlehem in July of that year, where Lampel inspected the plant on one or two occasions and negotiated for the purchase of Drohn's stock. Drohn represented that he had built up the Company to its then state of prosperity and that he controlled it, owning 58.2% of the shares. The upshot was that Drohn agreed to sell his 582 shares to Lampel for the price of $80,000.-00; cash in the sum of $8,000.00 was to be paid upon consummation and the balance of $72,000.00 was to be paid in yearly installments of $8,000.00. Drohn also agreed to have his attorney reduce the terms of the sale to writing and notify Lampel when the contract was ready. It is not clear that notice was given, but on August 2, 1946, Lampel, accompanied by the plaintiff Hosea, returned to New Bethlehem and met Drohn. The written contract was not produced by Drohn. Instead, he demanded an additional $15,000.00 on account of his interest, as he put it, in the surplus of the corporation. He also claimed that he was entitled to this $15,000.00 because in round figures it represented 58.2% of the cash on deposit in the Company's bank accounts and that this was his money. He used such expressions as—"How about giving me my cash out of the bank?" and "Whoever heard of any one selling his cash?" It is also alleged that Drohn claimed a personal interest, as distinguished from a stockholder's interest, in certain

money and stock to be found in the Company safe. Lampel became incensed at this demand and refused to agree to the additional sum, but Hosea, who had become interested, engaged in further negotiations with Drohn for the purchase of his stock.

During this meeting Hosea wrote two memoranda of sale; one proposing a purchase price of $80,000.00, the other proposing a price of $95,000.00; neither was executed; in both Lampel and Hosea appeared as the purchasers.

As the meeting terminated, Lampel proposed to pay $23,000.00 down on a sale of the stock for $80,000.00. He wrote his name, address and telephone number on the back of the paper containing the $95,000.00 proposal and left it with Drohn in case he wished to write or telephone. The paper containing the $80,000.00 proposal was retained by Hosea.

At this point Drohn had gone back on his oral agreement to sell his stock for $80,-000.00, but the door to further negotiations was not entirely closed.

Plaintiffs then knew that Drohn wanted $15,000.00 more than had been agreed. That sum was substantially equivalent to his share of the cash in banks, i. e., if then the Company had declared a dividend out of this cash. All parties knew, however, that no dividend had been declared prior to or pending these negotiations.[1]

Subsequently, Drohn telephoned Lampel and advised that the sale could be consummated on August 13, 1946. Plaintiffs returned to New Bethlehem on that day and, meeting Drohn in the offices of the Company, examined the written contract of sale which he produced and which had been prepared by his attorney as originally agreed, viz., the purchase price therein set forth was $80,000.00 for 582 shares; the purchaser named was Charles A. Lampel; the down payment specified was $8,000.00; and the deferred payments of $72,000.00 called for nine notes payable one per year for the succeeding nine years. The New Bethlehem Bank was constituted a trustee with certain duties including the duty to hold the stock and vote for such persons as directors as the purchaser may desire.

The parties then went to the New Bethlehem Bank. There the written contract was amended to include Hosea as one of the purchasers, the number of shares to be held in escrow was reduced to 578; the other four shares were intended to qualify four new directors. While the cashier, W. R. Strong, was supervising these changes, Lampel and Hosea, in a private room, each gave $7,500.00 in cash to Drohn. Upon receiving the money, Drohn signed a "receipt" written by Hosea, which is as follows:

> "August 13, 1946
>
> "Received of Max E. Hosea and Charles A. Lampell [sic] of Indianapolis, Indiana ($15,000.00) Fifteen Thousand Dollars as part payment on purchase of 582 Shares of Community Telephone Company stock of New Bethlehem, Pennsylvania this is in lieu of any dividend due on this stock and I hereby assign and transfer to Hosea and Lampell all my rights title and interest whatsoever, in said money and dividends and also my interest in the stock and money left in the safe at the telephone office. I further agree to not deal in (sic) directly or indirectly in the purchase of stock of the Community Telephone Company of New Bethlehem, Pennsylvania. It is also understood that the telephone company owes me no back interest, salary, rent, or another claim whatsoever.
>
> "H. H. Drohn
>
> "Witness
>
> "W. R. Strong."

Hosea left the room taking this document to Mr. Strong and requested him to witness Drohn's signature. This he did, but Hosea did not permit him to read the paper. In fact it was not until July 12, 1947, that any one connected with the New Bethlehem Bank was informed by plaintiffs that an additional $15,000.00 was to be credited upon the purchase price of Drohn's stock.

After the plaintiffs had exchanged their $15,000.00 for Drohn's "receipt," Mr.

---

1. Paragraph 6 of the Complaint plainly indicates that plaintiffs understood defendant's demand of $15,000.00 to be a sum "which the telephone company had in the bank(s) and which might be allotted to his share."

Strong returned to the private office with the amended contract of sale. It was then executed by all parties. Also, nine notes totalling $72,000.00 were executed by plaintiffs. A draft in the sum of $8,000.00, in favor of Drohn, together with the original contract and the nine notes were delivered to the cashier.

Drohn procured the $8,000.00 draft from the cashier and immediately deposited it and the $15,000.00 in cash in his checking account at New Bethlehem Bank.

That evening at a meeting of the board of directors of the Telephone Company, plaintiffs attempted to secure control of the Company. Their efforts failed because only three of the seven existing directors resigned. However, Lampel was elected general manager and, apparently, Hosea was elected vice president.

Shortly thereafter plaintiffs each withdrew $7,500.00 from the bank accounts of the Company in order to reimburse themselves for the cash paid to Drohn, but because the minority stockholders protested, they delivered to the Company their demand notes for like amounts which notes were subsequently paid.

On October 21, 1946, plaintiffs executed an option agreement, and later an extension thereof, wherein, inter alia, they acknowledged their liability to Drohn for $72,000.00 as represented by the nine notes in the possession of the trustee Bank, and proposed to purchase the shares of the minority stockholders for $100.00 per share. All the circumstances indicate that plaintiffs were under severe pressure to execute this option.

The plaintiffs at no time attempted to disaffirm or rescind the transaction. Eleven months later, on July 12, 1947, plaintiffs wrote to both of the defendants demanding that credit be given them in the sum of $15,000.00.

From the foregoing account it first becomes necessary to determine whether the ultimate price of the stock was $95,-000.00 or remained at $80,000.00. It is certainly the law that all the preliminary negotiations merged into the written instruments executed by the parties on August 13. Gianni v. Russel & Co., Inc., 1924, 281 Pa. 320, 126 A. 791. The formal contract of sale plainly states the price to be $80,000.00; however, plaintiffs introduced into evidence the "receipt," which instrument was executed by Drohn contemporaneously with the contract of sale. Both instruments are part of this transaction and should be read together and construed with reference to each other. 17 C.J.S., Contracts, § 298; Wilson v. Viking Corp., 1938, 134 Pa.Super. 153, 3 A.2d 180. When this is done, and the other facts and circumstances are considered, a latent ambiguity arises in respect to the price of the stock, which ambiguity must be resolved by extrinsic evidence. 32 C.J.S., Evidence, § 961(b); see Logan v. Wiley, 1947, 357 Pa. 547, 55 A.2d 366; Simmons v. Dietrich, 1935, 117 Pa.Super. 408, 177 A. 477. It also seems to be the law that the real consideration of a contract may be shown by parol evidence. Tasin v. Bastress, 1920, 268 Pa. 85, 91, 110 A. 744; In re Cridge's Estate, 1927, 289 Pa. 331, 137 A. 455; Piper v. Queeney, 1925, 282 Pa. 135, 127 A. 474.

From the evidence, it seems apparent that on August 13, 1946, Drohn did not intend to sell his stock to plaintiffs for $80,-000.00 as he had previously agreed. Drohn, asserting his "ownership" of a percentage of the money in the banks, refused to sell unless they first paid him an additional $15,-000.00. It also seems clear that Lampel and Hosea paid the $15,000.00 in cash to Drohn in order to induce him to execute the formal contract of sale. They also knew that Drohn did not intend, nor did they then expect him to credit the $15,000.00 payment on the purchase price of $80,000.-00. Plaintiffs' belated claim for credit has the distinct flavor of an afterthought. Unworthy motives on the part of both plaintiffs and the defendant Drohn could explain why the contract, which they had amended in several particulars at the Bank, did not include an amendment to increase the price from $80,000.00 to $95,000.00, or to increase the down payment from $8,000.00 to $23,-000.00, or to decrease the indebtedness from $72,000.00 to $57,000.00. Obviously, each side knew that the other was trying to overreach and knew precisely what the other was trying to accomplish.

■ Thus, when plaintiffs privily handed $15,000.00 in cash to Drohn "as part payment on purchase" of the shares, and immediately thereafter deliberately proceeded to obligate themselves for an additional $80,000.00 by openly executing the amended contract of sale, they effectively agreed to pay a total of $95,000.00 in order to acquire this stock. If they entertained any secret intentions that the cash payment ultimately should be credited upon the expressed consideration of $80,000.00, such secret intentions did not then and can not now affect the result of their plainly manifested intentions.

■■ The "receipt" for the $15,000.00 also included a supplemental agreement by Drohn "to not deal in (sic) directly or indirectly in the purchase of stock of the Community Telephone Company." We think a fair interpretation of this covenant precludes Drohn from becoming a stockholder. He contends that he did not read the instrument which he signed. This neglect, however, does not reduce his obligation thereunder or its legal effect. Berardini v. Kay, 1937, 326 Pa. 481, 192 A. 882, 884. Since he has subsequently purchased one share, he has violated his agreement and the bill will be retained for the purpose of compelling Drohn to dispose of that share.

■ The remaining question is: Did Drohn's false representations induce plaintiffs to pay an additional $15,000.00 for the stock? We think not. Drohn was a business man of mature years and long experience, and knew the functions of a corporation. Lampel was a telephone engineer and owned a small telephone company in Arkansas. Hosea was an expert telephone man; he also was a lawyer and had been admitted to the bar in Indiana in 1933, but practiced only before the public utilities commission of that State in connection with his own telephone business. The parties were dealing at arms' length. Lampel had accused Drohn of breaking the oral agreement to sell and his suspicions were therefore aroused. He had sought and secured expert advice from Hosea. Both plaintiffs had inspected the plant, bank accounts, and company records more or less fully. See Mahaffey v. Ferguson, 1893, 156 Pa. 156,

168, 27 A. 21. Since no representations had been made that a dividend was payable, Drohn's statements, to the effect that he personally owned approximately $15,000.00 of the bank funds deposited in the Company account and had a personal interest in the money and stock in the Company safe, were designed to influence plaintiffs to pay $95,000.00 instead of $80,000.00 for the stock. Although the representations were false, plaintiffs, as well as Drohn knew, or should have known, that they were simply characterizations of Drohn's interest as a stockholder in the Company's assets; their falsity is so obvious as to preclude the inference that plaintiffs paid $15,-000.00 in reliance upon their literal meaning. See Restatement of Contracts, Section 476, Comment d; Williston on Contracts, page 4229, Sections 1515, 1516; Restatement of Torts, Sections 537, 538, Comment c; Section 541. It taxes credulity that experienced business men would agree to trade dollars as plaintiffs would have the court believe. Plaintiffs in the exercise of common prudence and diligence were not justified in relying upon these representations. Compare: Slaughter's Adm'r v. Gerson, 1871, 80 U.S. 379, 13 Wall. 379, 20 L.Ed. 627; Andrus v. St. Louis Smelting Co., 1888, 9 S.Ct. 645, 130 U.S. 643, 647, 32 L. Ed. 1054.

■ Although part of the "receipt" which Hosea wrote is couched in vague language, it is implicit therein that the $15,000.00 paid Drohn as "part payment on purchase of 582 Shares" was for *Drohn's interest as a stockholder* in money and dividends, and stock and money in the Company safe. Instead of proving fraud by clear and satisfactory evidence, which burden is upon the plaintiffs, Ralston v. Philadelphia Rapid Transit Co., 1920, 267 Pa. 257, 110 A. 329, this document tends to prove that the plaintiffs correctly interpreted Drohn's misrepresentations to mean his share as a stockholder in the Company assets.

The net effect of Drohn's statements was to convince plaintiffs that he would not sell his stock to them for $80,000.00 until he caused a dividend to be declared which would pay him $15,000.00. It was natural for plaintiffs to believe that if they pur-

chased the stock for $95,000.00 they would be able to recover the additional $15,000.00 by way of dividends. That they failed to achieve this result in August, 1946, was due to their neglect in procuring the written resignations of four directors prior to the purchase.[2]

Appropriate findings of fact, conclusions of law, and a decree will be filed herewith.

2. Plaintiffs knew that the resignations of four directors were essential to obtain control of the Company, but only three resignations were actually procured.