## Nace's Estate

274

*Charles M. Bolich*, for accountant.

*William B. Butz*, guardian ad litem for minors.

*George W. Aubrey, Robert E. Haas, Groman & Rapoport, Joseph B. Walker, Wilson A. Wert, Otto Wiencke* and *Francis J. Gildner*, for claimants.

GEARHART, P. J., September 3, 1936.—We have before us for audit the first and partial account of Lehigh Title Guarantee Company of Allentown, Pa., substituted trustee of Arthur Elmer Nace, Charles David Nace, and Marian Genevive Nace, under deed of trust of Ruth V. Nace, deceased, dated April 28, 1931.

Ruth V. Nace died April 26, 1932. The Penn Trust Company was named trustee in the trust agreement. The Penn Trust Company being defunct, this court on February 9, 1933, appointed the Lehigh Title Guarantee Company of Allentown, Pa., substituted trustee. When the case came on for audit accountant presented a petition stating that the three beneficiaries under the trust agreement were minors (the three children of the settlor, Arthur, Charles, and Marian Nace, respectively, 17, 15, and 10 years of age), and asking "that a guardian ad litem be appointed for the reason that certain claims made against the estate should be carefully investigated prior to said audit." Thereupon the court appointed William B. Butz, Esq., guardian ad litem.

Sometime thereafter Mr. Butz filed his report, based on an investigation of the matters that were subsequently to be heard at the hearing. The two important questions raised by the guardian ad litem relate to the claim of Robert E. Haas, Esq., arising out of the trust agreement

dated April 28, 1931, and the claim of Charles M. Bolich, Esq., for services rendered accountant. These and several other matters which will be hereinafter discussed, form the subject of this accounting. . . .

### Claim of Robert E. Haas, Esq.

The claim of Mr. Haas is founded on the acknowledgment of indebtedness in the fourth "whereas" clause of the trust agreement dated April 28, 1931. The instrument, after reciting that settlor is the daughter of Minnie Conner Gross, niece of Robert B. Conner, who died leaving a last will and testament under which settlor is bequeathed a certain portion of his estate, proceeds as follows:

"Whereas, Ruth V. Nace is indebted to Robert E. Haas, Esq., of Allentown, Pennsylvania, for professional services rendered in the sum of $10,000.00;

"Whereas, Ruth V. Nace desires to establish an irrevocable trust for the benefit of herself and children;

"Now, know all men by these presents, that the said Ruth V. Nace hereby sells, et cetera . . . et cetera, all her right and interest in the Estate of Robert B. Conner and in the Estate of her mother, Minnie Conner Gross, irrevocably in trust (a) to collect and obtain possession of all the property, funds and things of value passing under this assignment or deed of trust and (b) to pay out of the funds or property thus received, any expenses that may be incurred in obtaining the same (c) to pay and discharge all the indebtedness of the said Ruth V. Nace, to Penn Trust Company, of Allentown, Pa., (d) to pay to Robert E. Haas, Esq., his heirs, executors, administrators and assigns, the sum of $10,000.00 for legal services rendered, and (e) to hold the balance of residue irrevocably in trust nevertheless for the uses and purposes and subject to the powers and provisions hereinafter set forth."

The testimony reveals that Mr. Haas served Mrs. Nace as attorney in a confidential capacity from sometime in 1929 until her death, April 26, 1932. He formerly repre-

sented Mrs. Nace's mother, and later her own interest in the litigation arising out of the estate of Robert B. Conner, deceased; he served as her attorney in the settlement of her mother's estate, and was her lawyer in the divorce proceedings instituted by her husband, Elmer Nace. During this period of time she consulted with Mr. Haas about every conceivable personal affair. When in Allentown she visited his office as often as four times a week, taking as much as two hours of his time. Her demand on his time knew no bounds.

It was the case of a woman unaccustomed to affluence, suddenly having money thrust upon her. From the lavish manner in which she proceeded to spend the money, she apparently thought it without limit. The testimony discloses that in the course of two years preceding the execution of the trust agreement she had spent about $40,000. It should be stated that included in this amount was $10,-000 given to her husband, Elmer Nace, and the purchase of a home.

With the coming of money came also marital difficulties, and this after much bickering resulted in a divorce and a monetary settlement on the husband. Through all this Mr. Haas was her counsel and adviser, and Mr. Bolich then, as now, represented her husband, Elmer Nace.

After the divorce from her husband Mrs. Nace found new avenues of life. There came a time in the early part of 1931 when she told her counsel that she would sell her inheritance of $150,000 in the Conner estate for $15,000 ready cash. With the reiteration of this intention Mr. Haas, out of a desire to protect Mrs. Nace from her own improvidence, repeatedly discussed the matter of a trust agreement, and consequently drafts of several trust agreements were formulated, which eventuated in the execution of the one before us.

The guardian ad litem, in a well-written report based on an investigation of the facts, took the position that in view of the confidential relationship existing between Mr.

Haas and his client, Mrs. Nace, counsel had the burden of demonstrating that the trust agreement represented the unfettered judgment of his client, and that it was entered into freely, voluntarily, and with full intelligence of all the surrounding facts; that the transaction was beyond suspicion. We so ruled at the hearing.

The rule is stated in 6 C. J. 735, sec. 310 (*b*) :

"Contracts Made after Relation Established-aa. In General. A contract between an attorney and client for the former's compensation, entered into during the existence of the relation, is not void, although presumptively invalid, the burden of showing fairness resting on the attorney."

See also 1 Perry on Trusts, chap. 6, sec. 202. Again, in A. L. I. Restatement of Trusts, vol. 1, sec. 2 :

"A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. . . . As to matters within the scope of the relation he is under a duty not to profit at the expense of the other. . . . If the fiduciary enters into a transaction with the other and fails to make a full disclosure of all circumstances known to him affecting the transaction or if the transaction is unfair to the other, the transaction can be set aside by the other."

Our research has not brought to light any case where the facts disclosed an acknowledgment of indebtedness to an attorney by a client of unquestioned mentality who had independent advice and seems to have understood the nature of her act, where, as here, the acknowledgment does not exceed eight percent of her estate. The heavy burden of compelling one in a fiduciary relationship to show expressly that the arrangement was fair and conscientious springs from the relationship of the parties and is founded upon a notion of general policy. Said the Supreme Court in Greenfield's Estate, 14 Pa. 489, 505 :

"In requiring this, courts of equity act irrespective of any admixture of deceit, imposition, overreaching, or

other positive fraud. As it has often been said, the principle stands independently of such elements of active mischief."

See also Darlington's Estate, 147 Pa. 624; Cook v. Donaldson et al., 296 Pa. 389; Thorndell, Admx., et al. v. Munn, 298 Pa. 1, 9; McConville v. Ingham et al., 268 Pa. 507, 518; Corrigan, Executrix, v. Conway, 269 Pa. 373; Palmer v. Foley et ux., 305 Pa. 169, 175.

Resuming the narrative, the testimony shows that on several occasions Mr. Haas discussed with Mrs. Nace the amount of his fee for services rendered, and that at one interview she spoke of making a substantial gift to him in gratitude for what he had done for her. Mr. Haas at that time informed her that he was not interested in a gift but only desired fair compensation for the services rendered. After several discussions the amount was fixed at $10,000, which was agreed to by Mrs. Nace. This occurred in March 1931, and it was at this time that Mr. Haas was drafting the trust agreements in rough. In April 1931, about ten days before the execution of the agreement, Mr. Haas conferred with Harvey H. Steckel, Esq., a member of this bar, informing the latter of the intended trust agreement, with particular reference to his fee, and requested Mr. Steckel to go over the whole matter with Mrs. Nace and draft the trust agreement, at the same time handing to him disconnected writings, representing in rough what Mrs. Nace had desired in the agreement. Mr. Steckel took the papers and conferred with Mrs. Nace on four different occasions. Mr. Haas was not present. What took place is best shown by the testimony of Mr. Steckel, who testified, in part:

"Q. At these different meetings these matters were discussed with her before she executed the deed?

"A. Let me correct something. I do not believe that she was in my office more than four times. The first time was a long conference in which I got to my own satisfaction exactly what was in her mind. I made rough drafts

and, when she came in at another interval, I went over them and made some corrections, and when the arrangement was in the form that it was signed I went over that in detail with her and particularly again at that time called her attention to the fact that $10,000 was a lot of money, a big lawyer's fee, and again satisfied myself that she realized the services that Haas was rendering for her and she was satisfied that the fee was reasonable and fair and wanted to pay.

"Q. Tell us what you said?

"A. I read her the phraseology contained in this instrument. My recollection is that, after all these years, the word 'debt' is used. There it is. 'Whereas Ruth V. Nace is indebted to Robert E. Haas'. I explained the significance of that declaration.

"Q. What was said with reference to paying this sum to Robert E. Haas?

"A. It says in there this was in litigation. When the money came he was to get his, the rest tied up, and she was particularly anxious to have a backlog for the youngsters."

The agreement as it stands represents the work of Mr. Steckel, who testified that he drew most of the agreement in lead pencil, dictated portions, and combined memoranda at hand. In its final form the stenographer did the typing. The agreement was finally executed by Mrs. Nace in the presence of Mr. Steckel and the stenographers, Miss Zakutny and Miss Huber. Mr. Haas was out of town on the day the agreement was executed.

Mrs. Nace during her lifetime never raised a question about the fairness of the fee; on the other hand, she spoke to one of her friends in laudatory terms of the services rendered by Mr. Haas. In addition to the foregoing facts, Mr. Haas recited the services rendered Mrs. Nace.

Under all the testimony we are satisfied that the work performed by Mr. Haas was extended and frequent; that the demands made upon his time by Mrs. Nace were per-

sistent and of the most annoying kind. Mrs. Nace shortly before executing the agreement was so anxious to get ready cash that she had expressed herself as willing to assign her share in the Conner estate to anyone who would give her $15,000. It is our settled opinion, based on the evidence, that if Mr. Haas had not been able to arrange the financial affairs of Mrs. Nace to the latter's satisfaction and to induce her to enter into the trust arrangement· for the purpose stated, to protect her from her own improvidence, and for the future welfare of her children, there would today be no estate on hand to adjudicate. His foresight and patient counsel certainly saved for the children and surviving husband what there is here.

Our conclusion is that Mr. Haas has carried his burden by demonstrating that Mrs. Nace had a thorough understanding of the trust agreement; that she was satisfied with it, and the amount of the fee; that there was no undue influence or coercion exercised on her by anyone in the execution of the same; further, she had ample time to consider in detail the matters contained in the agreement; and more than that, she had the independent advice of Mr. Steckel, an honorable and competent attorney of this bar.

After hearing the testimony of Mr. Haas as to the services rendered, we cannot say that the fee agreed upon, while large, was excessive. Accordingly, the trust agreement must be sustained, and the sum of $10,000 is awarded to Mr. Haas, with interest from September 16, 1935, which represents the date this accountant received the funds from the Mauch Chunk Trust Company, and under the agreement represents the time when the fee was payable to Mr. Haas.

### Claim of Charles M. Bolich, Esq.

Accountant claims credit in the aggregate sum of $12,500 for fees paid Mr. Bolich as counsel. Mr. Butz, as guardian ad litem for the minor children, excepts to

this credit on the ground of excessiveness. Accountant, in attempting to justify the payment to Mr. Bolich, relies on the testimony of the latter as to what services he has rendered, and the opinion of members of the bar as to the reasonableness of the charge. The guardian ad litem, in order to show that the fee paid is unreasonable, relies on facts adduced by cross-examination of Mr. Bolich and the testimony of other members of the bar as to what is a fair and reasonable charge in the circumstances.

The determination of the fee in question presents the usual unpleasant problem inherent in the situation. It was said by Mr. Justice Mitchell in Good's Estate, 150 Pa. 307, 310:

"The amount of fees to be allowed to counsel, always a subject of delicacy if not difficulty, is one peculiarly within the discretion of the court".

It is a question about which even members of the bar may honestly differ among themselves, as this case aptly demonstrates. The testimony of the members of the bar as to a reasonable charge for the services rendered by Mr. Bolich ranges from $4,800 to $16,000.

Dealing with the services rendered, we find from the testimony that accountant was appointed successor trustee to the defunct Penn Trust Company on February 9, 1933; that there was then pending before the auditor appointed by the Orphans' Court of Carbon County a proceeding to distribute the balance in the hands of the Mauch Chunk Trust Company, executor and trustee under the will of Robert B. Conner, deceased, to the parties entitled under the will. The auditor held his first hearing on June 14, 1932. Mr. Haas appeared at that time for the Penn Trust Company. Mr. Bolich and his associate, the late James M. Breslin, Esq., appeared for Elmer Nace, former husband of Ruth V. Nace and natural guardian of the minor children. The auditor held his next meeting June 21, 1932, at which time Mr. Haas

appeared for the Penn Trust Company, and Mr. Breslin for Elmer Nace. Mr. Bolich was not present.

At this time an argument was presented by Mr. Breslin raising the question of the validity of a certain stipulation filed by the Penn Trust Company, wherein it was agreed that the Nace Estate should receive a three-eighth interest. It was the contention of Mr. Bolich and Mr. Breslin that by the terms of the will the Nace Estate was entitled to a one-half interest. The auditor ruled against the contention of Mr. Bolich and filed his report on July 6, 1933, overruling Mr. Bolich's exceptions. Mr. Bolich pressed his exception before Judge Shull, who specially presided.

The exceptions related not alone to the distribution of the fund, but also to the fee of $3,000 charged by the auditor. Another question raised before the court at that time was the right of accountant as successor in trust to the Penn Trust Company to repudiate the stipulation entered into by the Penn Trust Company, trustee. Eventually Judge Shull sustained the position of Mr. Bolich in his contention as to the correct construction of the will, and also as to the right of the new trustee to repudiate the stipulation. Whereupon, two separate appeals were taken to our Supreme Court by other interested legatees adversely affected by the ruling of the lower court. The facts are fully stated in Conner's Estate (No. 1), 318 Pa. 145, and Conner's Estate (No. 2), 318 Pa. 150. Mr. Bolich represented the Lehigh Title and Guarantee Company, trustee, appellee in the cases before the Supreme Court. The decisions of the Supreme Court were favorable to Mr. Bolich's clients, the higher court sustaining the ruling of the lower court.

The effect of these decisions was to give this estate $40,000 to $50,000 more than would have been received under the stipulation theretofore entered into by the former trustee. We place the enhancement in round figures for the reason that it cannot be definitely ascertained from the account and the testimony.

Mr. Bolich in his testimony speaks of $50,000, but this is certainly the maximum amount under any method of calculation that the estate was enriched. It is difficult to ascertain the exact amount of enhancement because in the total debit of $145,307.57 there is included income of $27,394.24. Obviously, only one fourth of this amount represents the gain resulting from the contest before the lower court and carried to the Supreme Court. In addition to the $145,307.57 carried in the account, we were informed at the hearing that there are assets belonging to this estate which have not been distributed but will be received by the estate in the near future. As stated by Mr. Bolich, these assets represent one fourth of $60,000, or $15,000, and are composed of bonds and securities of unknown value. There are also bonds in the amount of $15,000 which were not distributed by the auditor. The bonds, we are informed, could not be equitably divided, and therefore the Orphans' Court of Carbon County directed the Mauch Chunk Trust Company to withhold the same for future distribution. This estate is entitled to one half of the bonds, or $7,500, at inventory values. In addition, the estate will receive one fourth of $25,000, or $6,250, representing the sale price of a silver mine, and an additional sum of $2,500, also arising out of the same transaction. Add to these figures $20,000 set up as a trust fund for Elmer Nace and the children, and we have a total amount of $51,250. Included in this latter amount are assets yet to be received, carried at inventory values. From the foregoing it can be seen that the benefit to the estate will be somewhere between $40,000 and $50,000. We note in the reports in Conner's Estate (No. 1), 318 Pa. 145, that the stipulation, if carried out, would have reduced this estate's share by $35,000.

In addition to conducting the litigation just referred to, Mr. Bolich presented three separate petitions to the orphans' court in Mauch Chunk, seeking to surcharge the executor. Mr. Bolich testified that he had prepared his

first petition in February 1933, and forwarded it to Mr. Breslin, cocounsel. Mr. Breslin delayed filing the petition until May 20, 1933, which was five days after the statutory limit of five years had expired. Mr. Bolich, of course, failed in his petitions seeking a bill of review. He lays this mishap directly at the door of his co-counsel. He informs the court that he made at least 50 trips to Mauch Chunk, and several trips to Stroudsburg. In a general way he avers that he was put to a great deal of trouble in searching the records of the orphans' court relative to this estate; that he had the greatest difficulty in getting at the status of this case; and that the Mauch Chunk Trust Company was hostile, which made his work unduly arduous. He informs us that he prepared briefs in support of his various moves, and that he attended 12 to 15 hearings before the auditor and the Orphans' Court of Carbon County on one matter or another.

Mr. Bolich points to the fact that through his efforts the fee of the auditor before whom the litigation had its inception was reduced from $3,000 to $1,000, and that out of his own fee he must pay the estate of his cocounsel $1,900. Mr. Breslin took no part in the matter before the Supreme Court, his services with the estate having terminated in June 1934.

Another matter of importance to the estate was in connection with the distribution of securities in kind. The record is not explicit as to how much this accomplished, but in a general way it was stated that the securities that came to the estate were of a higher type than those originally tendered. In all of these matters which have been so generally set forth, we might say we are giving Mr. Bolich the benefit of any doubt.

With the exception of the presentation of the petition for the bill of review, there is no doubt in our mind that Mr. Bolich was alert. He was persistently and doggedly seeking to do all he could for his client. The enhancement

of the estate between $40,000 and $50,000 is directly attributable to the labor and skill of Mr. Bolich and his co-counsel, Mr. Breslin. The question, of course, resolves itself into what a fair and reasonable fee is under all the circumstances.

The principle applicable to attorney fees has been stated as follows in 6 C. J. 750:

"The circumstances to be considered in determining the compensation to be recovered are the amount and character of the services rendered; the labor, time, and trouble involved; the nature and importance of the litigation or business in which the services were rendered; the responsibility imposed; the amount of money or the value of the property affected by the controversy, or involved in the employment; the skill and experience called for in the performance of the services; the professional character and standing of the attorney; the results secured; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee when it is to be contingent than when it is not. The financial ability of defendant may also be considered by the jury, not to enhance the amount above a reasonable compensation, but to determine whether or not he is able to pay a fair and just compensation for the services rendered, or as an incident in ascertaining the importance and gravity of the interests involved in the litigation. But what is a reasonable fee must in a large measure depend upon the facts of each particular case, and be determined like any other fact in issue in a judicial proceeding. While opinions are receivable and entitled to due weight, the courts are also well qualified to form an independent judgment on such questions, and it is their duty to do so."

In Crawford's Estate, 307 Pa. 102, 111, the present Chief Justice, writing the opinion of the Supreme Court, stated:

"We said in McKelvy's Appeal, supra, that the hearing judge was competent to fix the value of services. Fees

should be on a moderate scale of compensation, and none should be allowed but such as are fair and just: Equitable Trust Company v. Garis, 190 Pa. 544, 552; Wier v. Myers, 34 Pa. 377; Davidson's Est., 300 Pa. 26. When the fees of counsel come before the orphans' court, it is a function of the court to decide what is a reasonable and just compensation under all the circumstances."

In the instant case Mr. Bolich has not given us the benefit of his opinion respecting his charge for the several items of services rendered, contenting himself with bulking the value of the service and requesting a fee of $12,500. Likewise, for the most part the members of the bar who were called to testify as to what a reasonable fee should be did not relate just how they reached their respective conclusions, other than to say what they thought the fee should be for the aggregate services rendered.

It is true that several of the expert witnesses did allocate a certain compensation for the enrichment of the estate and the balance for services rendered generally in the matter. We recognize that the testimony of members as to what is a reasonable compensation in a given case in the absence of contradiction is entitled to consideration in determining the fee: Myers' Estate, 253 Pa. 537, 542.

In arriving at this conclusion we have given consideration to the testimony of Mr. Bolich and all the members of the bar. As stated before, the members of the bar differ widely among themselves as to what a reasonable fee should be in this case. Their opinion of the value of the services rendered by Mr. Bolich varied from $4,800 to $16,000. It is our opinion, generally speaking, that the expert witnesses placed entirely too much emphasis on the amount of the estate, and too little consideration to the labor, time and trouble involved. We do not in any way wish to be understood as minimizing what Mr. Bolich did in this case, but it does seem that under all the circumstances a fee of $12,500 is excessive.

The questions which gave Mr. Bolich the most difficulty were the construction of the will and the matter of his

right to repudiate the stipulation. Both questions, while taken to the Supreme Court in separate appeals, were closely related; both questions had been decided favorably to Mr. Bolich's client in the lower court. They enriched the estate between $40,000 and $50,000. For this service we think a reasonable compensation would be $5,000. For all the other services rendered we think Mr. Bolich has earned $3,000, or a total fee of $8,000.

In calculating the fee in this manner.it must be constantly borne in mind that most of the hearings held in Mauch Chunk revolved around the two major questions. Several were held on the petition attempting to surcharge, which proved abortive.

Aside from the two major questions we cannot say that the services performed by Mr. Bolich were much out of the ordinary. It is true that he encountered an abundance of hostility on the part of the Mauch Chunk Trust Company, but this is far from being unusual in the settlement of estates where conflicts arise with respect to the management of an estate or the construction of a will.

A fee of $8,000 in our opinion is a just and fair compensation for all the services rendered.

During the course of the hearing and in the brief of counsel some reference has been made to fees allowed by this court and the several courts of Pennsylvania. Among them is the Estate of J. Mark Mauser, file no. 18548, Orphans' Court of Lehigh County, wherein it was decided that a counsel fee of $12,500 was fair and reasonable. In that case the estate was appraised at $142,000, but an examination of the facts will show that the estate was in litigation for the best part of six years. Among other things counsel wrote approximately 1,000 letters, and had in the neighborhood of 1,500 conferences during the period of administration with the executors, exceptant, and her eight lawyers. It was also found as a fact that over the period of years counsel had given what amounted

to from 14 to 16 months of his professional time to the case. Lastly, the attorney who received that fee had practiced at this bar for 25 years and upwards, and was among its leaders.

The services rendered in the instant case in no way compare with the services rendered by counsel in the Mauser case. After all the fee must depend upon the particular facts of each case: Myers' Estate, supra, p. 542.

Accordingly, items of credit for counsel fees paid, to the aggregate amount of $4,500, are struck from the account and accountant surcharged in that amount.

### Other claims

Mr. Haas has requested $1,500 counsel fees for services rendered the Penn Trust Company, trustee. The testimony shown that Mr. Haas attended two hearings before the auditor at Mauch Chunk, made several trips to Mauch Chunk, corresponded with parties in interest, and generally looked after the interest of the trustee. Under all the circumstances we think $300 is ample, and we allow and direct that the accountant pay that sum.

Elmer Nace claims interest on the fund set aside for him by the trust deed dated December 6, 1930. By the terms of the trust agreement entered into between Ruth V. Nace and the Penn Trust Company of Allentown, trustee, Ruth V. Nace "conveyed, assigned, transferred and set over unto the said Trustee, its successors or assigns, the sum of $20,000 of the right, title and interest of the grantor of the estate of her late Uncle, Robert B. Conner."

Article 1 of the agreement provides:

"The trustee shall collect and take possession of the sum of Twenty Thousand ($20,000.00) Dollars which shall hereafter be due to the Grantor from the aforementioned estate, under the residuary clauses of said estate and the said sum of Twenty Thousand ($20,000.00) Dollars so obtained shall hereafter be referred to as the 'Trust Estate'. . . ."

The trust agreement vests the trustee with authority to collect and obtain the said $20,000, and directs the trustee to hold, manage and invest the same, and pay the entire net income from the trust estate to parties therein mentioned. One half of the net income is payable to Elmer Nace, and the entire net income from the second one half is payable to that parent, i. e., either the grantor or Elmer Nace, "whomsoever shall have the custody and care of the two male children of the Grantor and Elmer Nace."

Pursuant to this trust agreement the Lehigh Title Guarantee Company, as trustee under the deed of trust dated December 6, 1930, also the trustee under the deed of trust dated April 28, 1931, received assets from the Mauch Chunk Trust Company, trustee under the last will and testament of Robert B. Conner, deceased. At the time of the distribution of the fund by the Mauch Chunk Trust Company the income was not segregated.

Included in the account before us, as has been indicated, accountant has charged itself with the receipt of income earned on the entire fund. It would have been better had this matter of income been settled at the adjudication of the account of the Mauch Chunk Trust Company, but, since this was not done, Mr. Nace now asks us to adjust the matter equitably. The testimony discloses that from May 3, 1932, to September 16, 1935, Mr. Nace had in his custody and support his two male children. He accordingly requests that we award him interest on the amount of $10,000 from December 6, 1930, to May 3, 1932, and that we award him interest on $20,000 from May 3, 1932, to September 16, 1935.

Claimant has not indicated what income this fund of $20,000 has earned, and it is quite likely that he cannot, for the reason that no effort was made to set aside the $20,000 trust fund until the adjudication of the final accounting of the Mauch Chunk Trust Company as executor.

What other income this $20,000 trust fund earned is blended in the income received in the account before us. It seems but equitable and fair that some adjustment should now be made with respect to this income. We observe however, that Mr. Nace is asking for interest on the fund from December 6, 1930, the date of the trust agreement. From an examination of the trust agreement it would appear that the trustee could not possibly have received this $20,000 under the will of Robert B. Conner until the death of the last survivor of the nephews and nieces—in this case Josephine Remmel, who died October 6, 1931. Since the trust fund could not possibly be set up before October 6, 1931, it would not earn income before that date. Consequently, it seems that the equitable thing to do is to calculate interest from October 6, 1931.

Only the net income is payable to Elmer Nace under the terms of the agreement, and so we deem interest at the rate of 4½ percent equivalent to what would probably represent income on the fund over this period of time. We are fully cognizant of the fact that the fund might possibly have earned more than 4½ percent from October 6, 1931, to September 16, 1935, when the trust fund came into the hands of this accountant, but by the same token it might have been less.

Under all the circumstances the matter of income should be equitably adjusted on the basis of 4½ percent on $10,000 from October 6, 1931, to May 3, 1932, and interest at the same rate on $20,000 from May 3, 1932, to September 16, 1935, or a total sum of $3,291.25. . . .

And now, September 3, 1936, accountant is surcharged with the sum of $4,500 for overpayment of counsel fees. The account is confirmed subject to this surcharge, and accountant will make payment to the various creditors as hereinbefore set forth in the body of the adjudication. This decree to become absolute unless exceptions are filed within 10 days herefrom.